Rosemary M. Rivas (State Bar No. 209147)
Email: rrivas@zlk.com
Quentin A. Roberts (State Bar No. 306687)
Email: qroberts@zlk.com
**LEVI & KORSINSKY, LLP**
44 Montgomery Street, Suite 650
San Francisco, California 94104
Telephone: (415) 291-2420
Facsimile: (415) 484-1294

*Interim Lead Counsel for Plaintiffs
and the Proposed Class*

[*Additional Counsel listed on signature block.*]

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re LuLaRoe, LLC, Leggings Marketing, Sales Practices and Products Liability Litigation | Case No. 5:17-cv-00853-JGB-DTB |
| | <u>CLASS ACTION</u> |
| | **CONSOLIDATED CLASS ACTION COMPLAINT** |
| | <u>**JURY TRIAL DEMANDED**</u> |

Plaintiffs Suzanne Jones, Caitlin Goodwin, Tanya Mack, Mina Nicolle Ulaszek Benjamin, Terri Doran, and Emma Heinichen ("Plaintiffs") on behalf of themselves and all others similarly situated, allege the following based upon personal knowledge as to allegations regarding themselves, on the investigation of their counsel, and on information and belief as to all other allegations:

## I.    NATURE OF ACTION

1.     This is a class action seeking monetary damages, restitution, injunctive, and declaratory relief from Defendants LuLaRoe, LLC and LLR, Inc. ("LuLaRoe" or "Defendants") arising from their advertising, marketing, and sale of defective leggings and other clothing.

2.     Defendants sell brightly colored clothing, including leggings (the "Products" or "leggings") as well as dresses and tops, throughout the United States.  The Products, however, are not available in retail stores, or through the company website at www.lularoe.com.

3.     Instead, Defendants' business model relies on recruiting members of the general public, called Fashion Consultants (also known as "Fashion Retailers" or "Independent Retailers"), who buy the Products from Defendants at wholesale, and then sell the Products to consumers through in-home and online "boutiques."

4.     Defendants' business model is known as multi-level marketing ("MLM") or pyramid selling.  Other companies that operate under the MLM business model include Tupperware, Beachbody, Mary Kay, and Herbalife.

5.     As of 2017, there were approximately 80,000 Fashion Consultants selling Defendants' clothing, including the Products, throughout the United States.

6.     To become a Fashion Consultant, a person must make an initial investment ranging from $5,000 to $9,000, in what is called an "onboard package," which is essentially a package of clothing and marketing materials.

7.     LuLaRoe was founded in 2012 by DeAnne Brady and Mark Stidham, and the business has become very successful, very quickly.  Reports indicate that Product

sales have soared 600 percent to approximately $1 billion as of 2016.

8.     While Defendants are pleased with the company, many of the consumers who buy the Products for personal, family or household use (hereinafter, "Customers") are not.  Specifically, thousands of Customers have taken their outrage to Facebook and other online forums to complain about the defective Products.  Specifically, Customers have complained that the leggings are of such poor quality that holes, tears, and rips appear before wearing or during the first use.  The Products have also been described as tearing as easily as "wet toilet paper."

9.     Other problems with the Products include leggings that have one leg that is substantially larger (or smaller) than the other, and clothes that are supposed to be for adults but instead would only fit a child.

10.     Defendants are well aware that their Products are defective.  Patrick Winget, the head of production for Defendants, reportedly wrote in a January 2017 company-wide email about the leggings, "The leggings may get holes, *because we weaken the fibers* to make them buttery soft.  We have done all we can to fix them."  (Emphasis added.)

11.     Moreover, the defects that exist in the Products occur in the design and manufacturing stage, prior to receipt by Customers.  This is confirmed by the statement made by Defendants' head of production—that Defendants affirmatively weaken the fibers.  Furthermore, the defects are material in that they substantially affect the performance of the Products to function as suitable clothing.

12.     Defendants have received complaints regarding their defective Products since at least early 2016, before any of the Plaintiffs filed their complaints, by Customers complaining to the Better Business Bureau ("BBB") that the Products are defective in that they arrive with and/or develop holes and tears within the first use, or are unreasonably mis-sized despite Defendants' representations about size.

13.     Defendants' record for ignoring and/or not satisfactorily addressing Customer complaints about the defective Products has earned LuLaRoe an "F" rating from the BBB.

14.    It is clear that Defendants have chosen to sacrifice the quality of their Products in order to meet the growing demand at the expense of Customers.  The extent to which they have done this, however, is unacceptable.

15.    Defendants, as the manufacturers of the Products, are in exclusive possession of information providing them the knowledge about the inferior quality of their Products, including hundreds of complaints directly from Customers and their Fashion Consultants.  Defendants provide no disclosures on any Products about the defective and negligent construction or quality of the Products, even though they represent that their Products are of acceptable quality and fit for normal, ordinary use. Further, Defendants do not authorize their Fashion Consultants to disclose that the Products are defective and of negligent construction or quality.  Plaintiffs and Customers are not made aware of the defective nature of the Products until after their purchase and receipt of them.

16.    At all relevant times, Defendants misrepresented and suppressed material facts about the quality of their defective Products and negligently designed, manufactured, marketed, advertised, promoted, sold, and/or distributed such Products.

17.    Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure to redress Defendants' distribution and sale of defective Products, and misleading conduct, including the failure to disclose to Fashion Consultants and Customers that the Products Defendants designed, manufactured, distributed, and/or sold were and are defective and unfit for ordinary use.

18.    Plaintiffs allege claims on behalf of themselves and all others similarly situated for violations of the Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.*, the Consumers Legal Remedies Act, Cal. Bus. & Prof. Code §§ 1750, *et seq.*, the California False Advertising Law, Cal. Bus. & Prof. Code §§ 17500, *et seq.*, the Texas Deceptive Trade Practices Act, Tex. Bus. & Com. Code §§ 17.50, *et seq.*, the Oregon Unlawful Trade Practices Act, O.R.S. §§ 646.605, *et seq.*, breach of the implied warranty of merchantability, and unjust enrichment.

## II.    THE PARTIES

### A.    Individual and Representative Plaintiffs

19.    Plaintiff Suzanne Jones is a resident and citizen of Lafayette, California.

20.    Plaintiff Jones purchased leggings made by Defendants between approximately October 2016 and February 2017 from various Fashion Consultants. Specifically, before her purchases, Plaintiff Jones saw images of the leggings during Facebook "pop-up" sales by Fashion Consultants.  The images showed women wearing Defendants' leggings in various settings—there was nothing in the public representations to suggest the leggings would arrive with or immediately develop tears or holes.  The Fashion Consultants were authorized by Defendants to upload these pictures and/or live video of Defendants' Products on Facebook for the purpose of selling them to Customers, such as Plaintiff Jones.  Moreover, Defendants authorized the Fashion Consultants to represent that the Products were made by LuLaRoe.  Before purchasing Products from Defendants, Plaintiff Jones relied on the images of the Products she saw on Facebook, the fact that they were by LuLaRoe, and the fact that they appeared to be new and in good condition allowed her to reasonably believe they were suitable for ordinary use—the images gave her no reason to believe the Products were in fact defective and would develop holes and rips shortly after using them.  Additionally, based on the images and Defendants' representations regarding sizing, Plaintiff Jones had no reason to believe that the actual sizing of the Products varied from pair to pair, rendering some Products completely unfit for ordinary use.  Plaintiff Jones saw no disclosures that the Products were defective.

21.    Plaintiff Jones purchased one pair of leggings that was represented as being her size, however, she could not even get past her knees because they were so small, as if they were manufactured for a child.  Plaintiff Jones purchased two other pairs of leggings which developed holes when she pulled the leggings on with her fingers.

22.     Plaintiff Jones would like to purchase additional leggings in the future, however, she will not know whether they are defective or not because she purchases them online and cannot see them before she pays for them.

23.     Plaintiff Caitlin Goodwin is a resident and citizen of Berea, Ohio.

24.     Plaintiff Goodwin purchased leggings made by Defendants on or about January 28, 2017, from a Fashion Consultant.  Specifically, before her purchase, Plaintiff Goodwin saw images of the leggings during Facebook "pop-up" sales by Fashion Consultants.  The Fashion Consultants were authorized by Defendants to upload pictures and/or live video of Defendants' Products on Facebook for the purpose of selling them to Customers, such as Plaintiff Goodwin.  Moreover, Defendants authorized the Fashion Consultants to represent that the Products were by LuLaRoe.  Plaintiff Goodwin relied on the images of the Products she saw on Facebook, the fact that they were by LuLaRoe, and the fact that they appeared to be new and in good condition allowed her to reasonably believe they were suitable for ordinary use—the images gave her no reason to believe the Products were in fact defective and would arrive with and/or develop holes and rips shortly after using them.  Additionally, based on the images and Defendants' representations regarding sizing, Plaintiff Goodwin had no reason to believe that the actual sizing of the Products varied from pair to pair, rendering some Products completely unfit for ordinary use.  Plaintiff Goodwin saw no disclosures that the Products were defective.

25.     Plaintiff Goodwin purchased a pair of leggings, however, before she wore them, she discovered there was a hole in the leggings at the crotch.  Plaintiff Goodwin contacted the Fashion Consultant on or about February 7, 2017, for a refund.  The Fashion Consultant stated she could not give refunds because Defendants do not allow that and that Plaintiff Goodwin could only get an exchange, however, the product would not be the same.  Plaintiff Goodwin was also unsuccessful in getting a refund from Defendants directly.

26.     Plaintiff Goodwin would like to purchase additional leggings in the future, however, she will not know whether they are defective or not because she purchases them online and cannot see them before she pays for them.

27.     Plaintiff Tanya Mack is a resident and citizen of Wildomar, California.

28.     Plaintiff Mack purchased Defendants' leggings between May 2016 and March 2017 from a Fashion Consultant.  Specifically, before her purchase, Plaintiff Mack saw images of the leggings during Facebook "pop-up" sales by Fashion Consultants.  The Fashion Consultants were authorized by Defendants to upload pictures and/or live video of Defendants' Products on Facebook for the purpose of selling them to Customers, such as Plaintiff Mack.  Moreover, Defendants authorized the Fashion Consultants to represent that the Products were by LuLaRoe.  Plaintiff Mack relied on the images of the Products she saw on Facebook, the fact that they were by LuLaRoe, and the fact that they appeared to be new and in good condition allowed her to reasonably believe they were suitable for ordinary use—the images gave her no reason to believe the Products were in fact defective and would arrive with and/or develop holes and rips shortly after using them. Additionally, based on the images and Defendants' representations regarding sizing, Plaintiff Mack had no reason to believe that the actual sizing of the Products varied from pair to pair, rendering some Products completely unfit for ordinary use.  Plaintiff Mack saw no disclosures that the Products were defective.

29.     Plaintiff Mack purchased approximately 18 pairs of Defendants' leggings , and of those, 15 pairs either had holes upon receipt of them or developed holes within the first use.

30.     Plaintiff Mack would like to purchase additional leggings in the future, however, she will not know whether they are defective or not because she purchases them online and cannot see them before she pays for them.

31.     Plaintiff Mina Nicolle Ulaszek Benjamin is a resident and citizen of Bandera, Texas.

32.     Plaintiff Benjamin purchased Defendants' leggings between August 2016 and February 2017 from various Fashion Consultants.  Specifically, before her purchases, Plaintiff Benjamin saw images of the leggings during Facebook "pop-up" sales by Fashion Consultants.  The Fashion Consultants were authorized by Defendants to upload pictures and/or live video of Defendants' Products on Facebook for the purpose of selling them to Customers, such as Plaintiff Benjamin.  Moreover, Defendants authorized the Fashion Consultants to represent that the Products were by LuLaRoe.  Plaintiff Benjamin relied on the images of the Products she saw on Facebook, the fact that they were by LuLaRoe, and the fact that they appeared to be new and in good condition allowed her to reasonably believe they were suitable for ordinary use—the images gave her no reason to believe the Products were in fact defective and would develop holes and rips shortly after using them.  Additionally, based on the images and Defendants' representations regarding sizing, Plaintiff Benjamin had no reason to believe that the actual sizing of the Products varied from pair to pair, rendering some Products completely unfit for ordinary use.  Plaintiff Benjamin saw no disclosures that the Products were defective.

33.     Plaintiff Benjamin purchased four pairs of leggings that were represented as being her size, however, they were too small.  Plaintiff Benjamin tried to exchange them for leggings that were not mis-sized but was unable to.  Plaintiff Benjamin also purchased other leggings made by Defendants which either arrived with or developed holes after the first use.

34.     Plaintiff Benjamin would like to purchase additional leggings in the future, however, she will not know whether they are defective or not because she purchases them online and cannot see them before she pays for them.

35.     Plaintiff Terri Doran is a resident and citizen of Keizer, Oregon.

36.     Plaintiff Doran purchased leggings made by Defendants in 2016 and 2017 from a Fashion Consultant.  Specifically, before her purchase, Plaintiff Doran saw images of the leggings during Facebook "pop-up" sales by Fashion Consultants.  The Fashion Consultants were authorized by Defendants to upload pictures and/or live video of

Defendants' Products on Facebook for the purpose of selling them to Customers, such as Plaintiff Doran.  Moreover, Defendants authorized the Fashion Consultants to represent that the Products were by LuLaRoe.  Plaintiff Doran relied on the images of the Products she saw on Facebook, the fact that they were by LuLaRoe, and the fact that they appeared to be new and in good condition allowed her to reasonably believe they were suitable for ordinary use—the images gave her no reason to believe the Products were in fact defective and would arrive with and/or develop holes and rips shortly after using them. Additionally, based on the images and Defendants' representations regarding sizing, Plaintiff Doran had no reason to believe that the actual sizing of the Products varied from pair to pair, rendering some Products completely unfit for ordinary use.  Plaintiff Doran saw no disclosures that the Products were defective.

37.    Plaintiff Doran purchased Defendants' leggings which ripped or developed holes within the first or second use.  Plaintiff Doran was denied a refund.

38.    Plaintiff Doran would like to purchase additional leggings in the future, however, she will not know whether they are defective or not because she purchases them online and cannot see them before she pays for them.

39.    Plaintiff Emma Heinichen is a resident and citizen of San Francisco, California.

40.    Plaintiff Heinichen purchased leggings made by Defendants in 2017 from a Fashion Consultant.  Specifically, before her purchase, Plaintiff Heinichen saw images of the leggings during Facebook "pop-up" sales by Fashion Consultants.  The Fashion Consultants were authorized by Defendants to upload pictures and/or live video of Defendants' Products on Facebook for the purpose of selling them to Customers, such as Plaintiff Heinichen. The Fashion Consultant who sold Plaintiff Heinichen the leggings had a Facebook page dedicated only to selling LuLaRoe.  The Fashion Consultant would post photos multiple times per day and tag Plaintiff Heinichen in posts that would say "like and share this photo and comment your favorite type of fruit to enter the drawing for a free pair of leggings."  Moreover, Defendants authorized the Fashion Consultants to

represent that the Products were by LuLaRoe.  Plaintiff Heinichen relied on the images of the Products she saw on Facebook, the fact that they were by LuLaRoe, and the fact that they appeared to be new and in good condition allowed her to reasonably believe they were suitable for ordinary use—the images gave her no reason to believe the Products were in fact defective and would arrive with and/or develop holes and rips shortly after using them.  Additionally, based on the images and Defendants' representations regarding sizing, Plaintiff Heinichen had no reason to believe that the actual sizing of the Products varied from pair to pair, rendering some Products completely unfit for ordinary use. Plaintiff Heinichen saw no disclosures that the Products were defective.

41.     Plaintiff Heinichen purchased Defendants' leggings which ripped or developed holes within the first or second use.  Plaintiff Heinichen was unable to receive a refund for all of the defective leggings she purchased.

42.     Defendants, through their Fashion Consultants and website, www.lularoe.com, marketed and sold LuLaRoe branded leggings.  Leggings by their own definition provide covering of the legs.  Since Defendants' leggings were defective in that they arrived with and/or immediately developed holes and tears among other things, they did not provide covering.  Hence, Defendants' business practices were fraudulent, false, and/or misleading, including because Defendants did not disclose that the Products or leggings were not suitable for the ordinary purpose for which they are used because they did not provide covering.

43.     Defendants have records of all relevant purchase information of their Products.  Specifically, Defendants require their Fashion Consultants to process Customer purchases through Defendants' point of sale system.  As a result, Defendants maintain records of who purchased which Products and on what date.  Moreover, the records include the price paid by the Customers and the Customers' contact information.  Thus, Defendants have all purchase records as if Customers bought the Products directly from Defendants.

**B.**     **Defendants**

44.    LuLaRoe, LLC is a direct sales and multi-level marketing company with its headquarters in Corona, California.

45.    LLR, Inc. is a multilevel-marketing company headquartered in Corona, California.

46.    LuLaRoe, LLC and LLR, Inc. are collectively referred to herein as "Defendants" unless otherwise stated.

## III.   JURISDICTION AND VENUE

47.    This Court has original jurisdiction of this action under the Class Action Fairness Act of 2005.  Pursuant to 28 U.S.C. §§ 1332(d)(2) and (6), this Court has original jurisdiction because the aggregate claims of the members of the putative Class exceed $5 million, exclusive of costs, and at least one of the members of the proposed Class is a citizen of a different state than Defendants.

48.    The Central District of California has personal jurisdiction over Defendants because they conduct substantial business in this District and it is in this District where Defendants have employed, and continue to employ, the advertising, marketing, manufacturing, and sales activities detailed herein.

49.    Venue is proper in this District pursuant to 28 U.S.C. § 1391, because Defendants conduct operations, including sales and advertising, and thus transact substantial business within this District.  Specifically, Defendants sell and ship goods to Fashion Consultants who reside within this District and authorize these Fashion Consultants to advertise and sell the Products within this District.

## IV.   CALIFORNIA LAW APPLIES TO THE CLAIMS IN THIS CASE

50.    Application of California law is appropriate in this case.

51.    Defendants maintain their headquarters in Corona, California, and their legal departments and marketing departments, which were involved in the decision to advertise and sell the Products, are also likely located in California.

52.    Defendants' Founders, DeAnne Brady and Mark Stidham, who participate in the marketing and sales of the Products, also reside in California.

53.    In addition, Patrick Winget, Defendants' chief merchandise officer and chief designer ("CMO"), along with approximately twenty-one other employees, some of which inspect the Products, work at and maintain an office in Carson, California.

54.    Mr. Winget, in part, is responsible for overseeing the quality control of the Products.  Defendants maintain their records, in both hardcopy and in electronic format, in California.

55.    Further, since at least January 1, 2016, an apparel manufacturing company, MyDyer, a division of Providence Industries, has sourced/manufactured Products for Defendants.  MyDyer oversees the sourcing/manufacturing of the Products from the earliest stage of production through the shipment of finished Products.  MyDyer's facility is located in Carson, California, where it stores some Products.

## V.    FACTUAL ALLEGATIONS

### A.    Defendants' Business Model and Rapid Success

56.    LuLaRoe was founded in 2012 by DeAnne Brady, a former network marketer, and her husband, Mark Stidham.

57.    Defendants' business model depends on the recruitment of Fashion Consultants.  In order to attract individuals to undertake this position, Defendants cater towards busy women with children who want a flexible working opportunity to earn money.  A main pitch of Defendants is that mothers can earn money while selling their Products to friends in their living rooms and/or through online forums, such as Facebook. Many of Defendants' Fashion Consultants are millennial mothers.

58.    Fashion Consultants are authorized and encouraged by Defendants to sell the Products to their family and friends at parties, at home or online known as "pop-ups." Defendants also authorize Fashion Consultants to advertise that the Products are by LuLaRoe, and authorize them to use Defendants' images of the Products to share with Customers.

59.     It has been reported that Defendants have over approximately 80,000 Fashion Consultants.  Reports indicate that the company "on boards" approximately 150 to 200 new retail sellers every day, with the goal of getting 300 new Fashion Consultants per day.

60.     The initial investment for an individual to become a Fashion Consultant is not inexpensive; it costs between $5,000 and $9,000 to buy an "onboard package" which includes approximately 380 pieces of clothing and marketing materials (the "Onboard Package").  One report alleges, however, that Defendants encourage Fashion Consultants to keep about $20,000 in inventory at any given time, and further encourages them to reinvest in their business.

61.     Conservative calculations, based solely on the daily new Retail Sellers' Onboard Packages, demonstrate that Defendants are generating millions of dollars in revenue every day from their new Fashion Consultants.  That revenue excludes any partnership deals or subsequent purchases of Defendants' clothing by Fashion Consultants.  Based off of these lucrative numbers, it is evident Defendants want to provide Onboard Packages to as many new Fashion Consultants as they can, even if this means providing them with clothing that has holes in it and/or has been negligently manufactured.

62.     In order to become a Fashion Consultant, one can visit Defendants' website at www.lularoe.com and click on the tab, "Join the Movement."  The website boasts: "Becoming a LuLaRoe Fashion Consultant can provide you opportunity to have the means, the time, and the flexibility to pursue your passions and to more fully enjoy the company of those you love."[1]  In reality, however, many of the Fashion Consultants are ultimately caught in crosshairs between Defendants and the friends and family who they sold defective Products to.

---

[1]  Join the Movement, http://www.lularoe.com/join-the-movement-page (last visited February 16, 2018).

63.    Critics of Defendants believe that the high cost to become a Fashion Consultant is simply to convince the potential retail sellers that it is a real business that will provide a real return on investment.  Turning a profit, however, is difficult. "[Defendants] estimate[] the average commission that reps earn is a paltry $85 per year, according to Tracy Coenen, a forensic accountant and critic of the MLM industry, citing a 2015 income disclosure statement from LuLaRoe.  In a January post on her blog, Coenen described LuLaRoe as a 'grand scheme made to look like a real business.'"[2]

64.    Aside from investing thousands of dollars and having to sell hundreds if not thousands of pieces of Defendants' Products to make a return on their investment, excluding the time and expenses involved, Fashion Consultants' ability to be profitable is also greatly diminished because of the defective Products they receive from Defendants. As explained below, the time, effort, and expense involved with returns and exchanges also fall on Fashion Consultants.

65.    Thus, not only have Defendants outsourced the selling of their Products and the financial risk associated with that to Fashion Consultants, they have also shifted the burden of returns, exchanges, and Customer complaints to them.

B.    **Defendants' Defective Products**

66.    Defendants, through their website and through their Fashion Consultants, represent to the public that their Products are both comfortable and fit for ordinary, or even, athletic use.

67.    With respect to their Products, Defendants state: "Our leggings are ultra-stretchy and super soft.  They're as close to your own skin as you can get with all the perks of, ahem, not being naked.  You can sport them at your favorite Pilates class or throw on some cute booties and wear them out for a girls night!"[3]

---

[2]  LuLaRoe's business is booming, but some sellers are fuming, http://www.wtsp.com/money/consumer/lularoes-business-is-booming-but-some-sellers-are-fuming/420039896?utm_source=feedburner&utm_medium=feed&utm_campaign=Feed%3A+wtsp%2Ftopstories+(WTSP.com+10+News+Top+Stories  (last visited March 14, 2017).

[3]  Adult Leggings, http://www.lularoe.com/adult-leggings (last visited March 14, 2017).

68.     Thus, not only are Defendants (via their website and through their Fashion Consultants) impliedly warranting that their Products are fit for the ordinary use for which such goods are used, they explicitly warrant the Products are fit for athletic use.

69.     The Products, however, are unfit for the ordinary use for which such goods are used, much less athletic use.  Customers across the United States have complained that the leggings are ripping and developing holes after as little as a few hours of wear.

## C.     Defendants Have Been on Notice that Their Products Are Defective

70.     Unsurprisingly, thousands of outraged Customers across the United States have posted complaints about the defective Products they have purchased.  Defendants have long known about the poor quality of their Products since at least the beginning of 2016.

71.     The complaints regarding the defective Products are well documented and can be easily found on a variety of Internet forums, websites, and groups.  Below is a sample of typical complaints posted on the BBB's website:

- The quality has become extremely poor. The leggings developed holes within minutes of wearing them.  (Complaint submitted by Blakely P. on 3/7/2017.)

- Multiple items purchased have had holes, literally fallen apart in my hands, uneven lengths (leggings, one leg 4 inches longer than the other) and poor customer service.  (Complaint submitted by Shannon G. on 3/4/2017.)

- LuLaRoe is telling all staff and consultants to write positive reviews here – this info came directly from a high level "coach". Be WARY of this slimy company.  (Complaint submitted by Deanne S. 3/4/2017.)

- The leggings are garbage. I wore a pair from Vietnam for 4 hours and the whole seat of the pants developed tiny holes.  (Complaint submitted by Lynz on 3/4/2017.)

- I purchased two pairs of leggings brand new from two separate consultants. Both got holes within the first few hours of wearing them. Lularoe won't return them, so I'm just out $60. Stay far away! (Complaint submitted by Anon on 3/4/2017.)

- This company's products are horrible. I purchase[d] a pair of leggings and they ripped the first day I ever wore them. I tried to exchange them and was not refunded or given another pattern.  (Complaint submitted by Katie on 3/3/2017.)

- I ordered my first pair of LulaRoe Leggings, my first purchase from them in general, in December. After my first time wearing them, [I] found numerous pin holes in the butt area. I contacted the consultant I bought them from, she had me return them to her to exchange them. However, I had to pay for the shipping to both return the item and receive the new pair! So, now I've paid nearly $10 extra, and I'm afraid this pair will rip as well. (Complaint submitted by Nicole H. on 3/2/2017.)

72.     Defendants have been on notice that their Products are defective since at least January of 2016. When the BBB receives a consumer complaint, the BBB sends the complaint to the company and provides it an opportunity to respond. Customers have filed complaints with the BBB about the poor quality of Defendants' Products since at least January 2016. A large company surely is aware of the BBB and that it is one of, if not the main, forum for consumers to provide feedback to a company. As such, Defendants are aware of the submissions through the BBB and know that they have earned an "F" rating.

73.     Additionally, Defendants' spokespersons have publicly responded to online articles exposing Defendants for their defective Products. Defendants' responses can be traced back to at least early January of 2017.[4]

74.     Moreover, there is a Facebook group specifically dedicated to Customers who bought Defendants' defective Products, called LuLaRoe Defective/Ripped/Torn Leggings And Clothes. As of February 16, 2018, there are approximately 54,000 members.

75.     Members of the LuLaRoe Defective/Ripped/Torn Leggings And Clothes Facebook group post complaints about the defective Products on a daily basis and Defendants' employees and/or Fashion Consultants monitor the discussions of the Facebook group.

---

[4] *See* This clothing company is facing claims that its 'pants rip like wet toilet paper', http://www.businessinsider.com/lularoe-customers-complain-popular-leggings-are-tearing-2017-2 (last visited May 17, 2017).

**D.      Defendants Had Exclusive Knowledge That the Products Were Defective**

76.      Defendants have exclusive knowledge prior to sale that their leggings are defective, i.e., not according to the represented sizing or that they have holes or will develop holes during normal use.  Defendants know the specifications of the clothing they order from their manufacturers, and the types of material being used.  Defendants also visit the manufacturing factories and monitor the manufacturing process.  In fact, Defendants admit that they "weaken the fibers" during the manufacturing process.

77.      Moreover, Defendants' manufacturers send the clothing to Defendants in California before distribution to Fashion Consultants.  Defendants claim they inspect the Products, yet send them out to Fashion Consultants despite knowing about the defects.

78.      Additionally, Defendants are in exclusive possession regarding the number of Customers who have complained directly to them about the defective nature of the leggings.  Defendants also keep track of certain information regarding the Products that have been reported as defective, including the country of manufacture, among other things, but do not pass that information onto the Customers.

79.      Despite having exclusive knowledge regarding the defective nature of the Products, Defendants concealed these material facts from Customers by failing to make disclosures on their website and by failing to authorize their Fashion Consultants to make disclosures about the defective nature of the Products to Customers.  Plaintiffs and Customers are not made aware of the defective nature of the Products until after their purchase and receipt of them.

**E.      Defendants' "No Return" Policy Before This Lawsuit Was Filed**

80.      Before the filing of this lawsuit, Customers who bought and received defective Products were not allowed to return them to Defendants, either for a refund or an exchange.  Defendants' website clearly said that "[A]ny request pertaining to returns, damages, or shipping should go to the original Retailer you purchased from. THANK YOU."

81.     Thus, when a Customer complained directly to Defendants, he or she was either ignored, or told to contact the Fashion Consultant from whom they purchased the Products.  Based on this policy, many Customers were unable to obtain redress for their purchase of defective Products.

82.     While Fashion Consultants are supposed to contact Defendants to return the defective Product(s) and receive a credit, they have reported that when placing a call to Defendants in order to return damaged goods, they are placed on hold for an hour, and then disconnected.  Fashion Consultants also report that emails sent to Defendants regarding the defective Products go unanswered.  It is therefore unsurprising that Defendants have earned themselves an "F" rating on the BBB.

83.     Based on Defendants' unfair policies and tactics, Fashion Consultants will not provide refunds and in the few cases where they will offer an exchange, it will not be for the same item that a Customer purchased.  This is because one of Defendants' gimmicks is that they only make a limited number of patterns, roughly anywhere from 2,000-2,500 of a particular print per item.  As a result, Defendants have been able to create a high demand for a particular pattern, which are called "Unicorns."  In other words, a highly sought after pattern is a "Unicorn" and allows Fashion Consultants to charge significantly more.  Customers who received damaged "Unicorn[s]" never received refunds, though and, if in the rare circumstance was allowed by a Fashion Consultant to make an exchange, could not and did not receive the same item due to the limited numbers of patterns that Defendants offer.

84.     Additionally, to the extent a Fashion Consultant allows an exchange, a Customer is responsible for paying for the cost of shipping the defective Product to the Fashion Consultant, and for the Fashion Consultant's cost of shipping the replacement item to the Customer.

85.     Moreover, many Fashion Consultants report that they will only exchange unworn and unwashed clothing with tags attached that were originally purchased from them within a limited number of days.  This excludes thousands of Customers who wore

the Product once, sometimes for as little as a few minutes, at which point, the Product became ripped, torn, or developed a hole.  Customers who purchased Products during a party hosted by multiple consultants may not know the consultant from whom they purchased the Products from, and hence, will be unable to exchange the Product(s).

86.     To make matters worse, during weekly conference calls that DeAnne Brady and Mark Stidham hold with Fashion Consultants, Mark Stidham told Fashion Consultants not to spend time and energy sending defective Products back to the company, but that they should try to re-sell them to Customers, including by learning to sew and repair any defective Products.

### F.     Defendants' New Policies After the First Originally Filed Action

87.     After the filing of Plaintiffs' original Class Action Complaint on March 23, 2017, and Plaintiffs' compliance with the Consumers Legal Remedies Act, Cal. Civ. Code § 1782(a) ("CLRA"), Defendants instituted their "Happiness Policy," "LuLaRoe Limited Warranty," and "Make Good Program" (collectively the "Exchange Policies") as an attempt to salvage some of their reputation in Customers' eyes.

88.     Plaintiffs' lawsuit and notice pursuant to the CLRA was clearly the catalyst motivating Defendants to formulate and implement the Exchange Policies.

89.     While the Exchange Policies may appear to extend goodwill to Defendants' Customers, a closer look at them reveals that they do not provide adequate relief to Customers.  To begin with, a Customer is only eligible for the Happiness Policy or the LuLaRoe Limited Warranty if the purchase was made on or after April 25, 2017.  This excludes Customers who purchased defective Products from Defendants before that date.

### The Happiness Policy

90.     In short, the Happiness Policy states that Customers may return the clothing they are unhappy with to the Fashion Consultant they purchased it from within 30 days to receive "full refund, credit or exchange[]", or within the first 90 days to receive credit or exchange.  First, Defendants have placed an asterisk next to the word, "exchange" to disclose that due to the limited nature of the prints, the same Products may not be

available.  Thus, even if an exchange is processed, it is highly unlikely that the particular design in the Customer's size will be available, as Customers have repeatedly complained about.  The replacement leggings may also cost less than the amount paid for the original Product.  Customers choose specific designs and thus a similar "replacement" is inadequate.

91.     Additionally, Customers have to pay for the shipping and handling to send their defective Products back to the Fashion Consultant.  Thus, it is not a *full* refund or credit.  Further, this policy puts the onus on the Customer to reach out and negotiate with the Fashion Consultant.  Fashion Consultants are not required to accept returns, in fact, many Customers have complained that Fashion Consultants have ignored requests and/or been told that they will not be refunded.  Fashion Consultants have no incentive to honor this program as Defendants only issue the Fashion Consultants the wholesale value while the Customer is supposed to receive the retail price he or she paid.  Fashion Consultants must also pay for the shipping to Defendants and/or back to the Customer.  Thus, the Fashion Consultants lose money by honoring this system.  There are also complaints that Defendants have failed to issue credits in a timely manner.

**The LuLaRoe Limited Warranty**

92.     The LuLaRoe Limited Warranty is supposed to allow a Customer to return a defective item if done so within the first six months from the date of purchase.  Again, the Customers have the burden of tracking down the Fashion Consultant they purchased it from, and if they can, they will have to pay for the shipping.  Second, it is at Defendants' "sole discretion" whether to accept that the clothing is actually defective.  The warranty excludes the ambiguous categories such as "improper care, negligence, abuse, normal wear and tear, and the natural breakdown of colors and materials . . . ."  Even if a Customer makes it past these hurdles, Defendants will "replace it with a similar product[.]"  Again, a similar product is not what the Customer chose to pay for.

**The Make Good Program**

93.     The Make Good Program is supposed to cover Customers who do not qualify

for the Happiness Policy or the LuLaRoe Limited Warranty.  The Make Good Program is available for Customers who bought Defendants' clothing between January 1, 2016 and April 24, 2017, and who submit a claim no later than July 31, 2017.  Defendants never, however, provided notice directly to Customers about the Make Good Program.

94.     Like the other Exchange Policies, by its terms the Make Good Program requires the Customer to track down the Fashion Consultant they bought from, and pay for shipping to return it to them.  Moreover, an exchange is solely dependent on whether Defendants believe the clothing is defective.  If accepted by Defendants, any exchange will be a "similar product."

95.     Defendants state that if the Customers cannot connect with the Fashion Consultant they bought the defective Product(s) from, the Customers may contact the "Consumer Services T.E.A.M." which will help connect them to a different Fashion Consultant in their area.  This, however, does not address the issue that the Customers will still be out of pocket for shipping and/or will receive an inadequate "replacement." Moreover, there is no reason Customers who purchased Defendants' defective Products should have to spend the time and money required to track down Fashion Consultants and then submit to Defendants' sole discretion as to whether the Products are indeed defective.

96.     Defendants have the names, addresses, phone numbers, email addresses, Products purchased, and sales prices paid for each of their Customers, as Fashion Consultants provide such information to Defendants through Defendants' invoicing and point of sale system.  Defendants, however, erect barriers for Customers to take advantage of the Exchange Policies so few, if any, do.

97.     In sum, the Exchange Policies are insufficient.  In the best case scenario, Customers will be out of pocket for shipping expenses and/or will receive a replacement that is not adequately similar to what they originally chose.

## **CLASS ALLEGATIONS**

98.     Plaintiffs bring this action on behalf of themselves pursuant to Rule 23(a), (b)(2), (b)(3), and/or (c)(4) of the Federal Rules of Civil Procedure and on behalf of the following proposed Classes initially defined as follows:

(a) **Nationwide Class:** All individuals residing in the United States who purchased for personal, family or household use, LuLaRoe branded leggings.

(b) **California Subclass:** All individuals residing in California who purchased for personal, family or household use, LuLaRoe branded leggings.

(c) **Ohio Subclass:** All individuals residing in Ohio who purchased for personal, family or household use, LuLaRoe branded leggings.

(d) **Oregon Subclass:** All individuals residing in Oregon who purchased for personal, family or household use, LuLaRoe branded leggings.

(e) **Texas Subclass:** All individuals residing in Texas who purchased for personal, family or household use, LuLaRoe branded leggings.

99.     Plaintiffs reserve the right to redefine the Classes prior to class certification and after having the opportunity to conduct discovery.  Unless otherwise noted, the Classes will be collectively referred to herein as the "Class."

100.     Excluded from the Class are Defendants, their parents, subsidiaries, affiliates, officers, and directors, any entity in which Defendants have a controlling interest, and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

101.     Numerosity.  Fed. R. Civ. P. 23(a)(1).  The members of the Class are so numerous that joinder is impractical.  The Class consists of thousands of members, the precise number which is within the knowledge of and can be ascertained only by resort to Defendants' records.

102.     Commonality.  Fed. R. Civ. P. 23(a)(2) and (b)(3).  There are numerous questions of law and fact common to the Class, which predominate over any questions

affecting only individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    Whether Defendants misrepresented that the Products were suitable for wear when they were not;

(b)    Whether Defendants concealed material facts concerning the quality of their Products;

(c)    Whether Defendants were in possession of exclusive facts regarding the quality of their Products;

(d)    Whether Defendants authorized Fashion Consultants to disclose the quality issues with the Products;

(e)    Whether Defendants failed to employ quality control measures to avoid shipping defective Products;

(f)    Whether Defendants' advertisement and representations concerning their Products constituted false advertising under California law;

(g)    Whether Defendants engaged in deceptive, unfair, unlawful, and/or fraudulent business practices under California law;

(h)    Whether Defendants violated the California Consumers Legal Remedies Act;

(i)    Whether Defendants violated the Texas Deceptive Trade Practices Act;

(j)    Whether Defendants violated the Oregon Unlawful Trade Practices Act;

(k)    Whether Defendants breached the implied warranty of merchantability;

(l)    Whether Defendants were unjustly enriched;

(m)    Whether Class members are entitled to restitution, and in what amount; and

(n)    Whether Defendants should be enjoined from continuing the practices alleged herein.

103.    <u>Typicality.</u>  Fed. R. Civ. P. 23(a)(3).  Plaintiffs' claims are typical of the claims of the members of the Class, and, like all members of the Class, Plaintiffs purchased defective Products from one or more of Defendants' Fashion Consultants. Accordingly, Plaintiffs have no interests antagonistic to the interests of any other member of the Class.

104.    <u>Adequacy.</u>  Fed. R. Civ. P. 23(a)(4).  Plaintiffs will fairly and adequately assert and protect the interests of the Class, and retained counsel experienced in

prosecuting class actions.  Plaintiffs are adequate representatives and will fairly and adequately protect the interests of the Class.

105.  <u>Superiority of Class Action.</u>  Fed. R. Civ. P. 23(b)(3).  A class action is superior to all other available methods for the fair and efficient adjudication of this lawsuit, because individual litigation of the claims of all members of the Class is economically unfeasible and procedurally impracticable.  While the aggregate damages sustained by the Class are in the millions of dollars, the individual damages incurred by each member of the Class resulting from Defendants' wrongful conduct are too small to warrant the expense of individual lawsuits.  The likelihood of individual Class members prosecuting their own separate claims is remote, and, even if every member of the Class could afford individual litigation, the court system would be unduly burdened by individual litigation of such cases.

106.  The prosecution of separate actions by members of the Class would create a risk of establishing inconsistent rulings and/or incompatible standards of conduct for Defendants.  Additionally, individual actions may be dispositive of the interests of the Class, although certain Class members are not parties to such actions.

107.  <u>Injunctive and Declaratory Relief.</u>  Fed. R. Civ. P. 23(b)(2).  The conduct of Defendants is generally applicable to the Class as a whole and Plaintiffs seek equitable remedies with respect to the Class as a whole.  As such, the systematic policies and practices of Defendants make declaratory or equitable relief with respect to the Class as a whole appropriate.

108.  <u>Issue Certification.</u>  Fed. R. Civ. P. 23(c)(4).  In the alternative, the common questions of law and fact, set forth in Paragraph 102, are appropriate for issue certification on behalf of the proposed Class.

# COUNT I

### *Unfair Business Practices*
(California Business & Professions Code § 17200, et seq.
Unfair Competition Law ("UCL"))
### *On Behalf of Plaintiffs, the National Class, and the General Public*

109.   Plaintiffs incorporate and reallege by reference each and every allegation above as if set forth herein in full.

110.   The UCL defines unfair business competition to include any "unlawful, unfair or fraudulent" act or practice, as well as any "unfair, deceptive, untrue or misleading" advertising.  Cal. Bus. & Prof. Code § 17200.

111.   During the relevant time period, Defendants engaged in unfair business practices by selling defective Products to Fashion Consultants knowing that such Products would be sold to members of the general public, including Plaintiffs and Class members. Such Products were not suitable for the ordinary purpose for which the Products are used. As alleged herein, Defendants' conduct constitutes a breach of the implied warranty of merchantability.

112.   Defendants' practices constitute unfair business practices in violation of the UCL because, among other things, they are immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers and/or any utility of such practices is outweighed by the harm caused to consumers.  Defendants' practices violate the legislative policies of the underlying statutes alleged herein: namely, protecting consumers and preventing persons from being injured.  Defendants' practices caused substantial injury to Plaintiffs and members of the Class and are not outweighed by any benefits, and Plaintiffs and members of the Class could not have reasonably avoided their injuries.

113.   As a result of Defendants' unfair business practices, Plaintiffs have suffered injury in fact and a loss of money or property in terms of purchasing the Products that are unsuitable for their ordinary purpose as clothing, which they would not have purchased at all, or at the prices they paid.

114.    Pursuant to Business and Professions Code § 17204, Plaintiffs and the Class are entitled to an order of this Court enjoining such conduct on the part of Defendants, and any other orders and judgments that may be necessary to provide for complete equitable monetary relief by disgorging Defendants' ill-gotten gains, including the monies Defendants received or saved as a result of their wrongful acts and practices detailed herein, and restoring to any person in interest such monies paid for Defendants' Products by ordering the payment of full restitution plus interest.  Otherwise, Plaintiffs, Class members, and members of the general public may be irreparably harmed or denied an effective and complete remedy if such an order is not granted.

## COUNT II

### *Fraudulent Business Practices*
(California Business & Professions Code § 17200, et seq.)
### *On Behalf of Plaintiffs, the National Class, and the General Public*

115.    Plaintiffs incorporate and reallege by reference each and every allegation above as if set forth herein in full.

116.    A business act or practice is "fraudulent" under the UCL if it is likely to deceive reasonable consumers.

117.    Defendants have misrepresented their Products.  Specifically, Defendants have disseminated, through their network of Fashion Consultants, Products that are defective and not fit for ordinary use.  Additionally, Defendants disseminated to their Fashion Consultants images showing that the Products were suitable for ordinary purposes for which such Products are used.  Defendants authorized Fashion Consultants to use these images and photos of the Products for purposes of marketing and selling the Products to Customers.  Defendants also authorized Fashion Consultants to show images of the Products during pop-up sales both online and in person.  Defendants, on their website and through their Fashion Consultants, represented that they were selling leggings, which by definition means coverage for the legs.  The Products, however, did not provide coverage for the legs.

118.   Defendants omitted material facts they were obligated to disclose regarding the defective nature of their Products, namely, that they are of such poor quality they are not fit for the ordinary purposes for which such Products are used and do not provide coverage.  The facts concealed or not disclosed by Defendants with respect to the defective Products at issue are material in that Plaintiffs, Class members, and the general public would have considered these facts to be a substantial factor in deciding whether to purchase Defendants' Products, and the price to pay for Defendants' Products. Defendants concealed these material facts from Fashion Consultants and Customers, and/or did not authorize Fashion Consultants to disclose material facts to Customers regarding the defective nature of the Products.  Defendants also failed to disclose the true quality of the Products on the Products themselves or on their website.

119.   Plaintiffs and Class members had a reasonable expectation that the Products they were purchasing would not be defective and would be fit for the ordinary purposes for which such Products are used, i.e., for wearing and being covered.  The thousands of complaints posted on various online communities and message boards substantiate these expectations and assumptions.

120.   Based on the facts detailed herein, Defendants were under a duty to Plaintiffs and Class members to disclose the poor quality of the Products.  Such a duty existed because Defendants had exclusive possession and knowledge of facts—that the Products were unsuitable for the ordinary purposes for which they are used, due to their poor quality—that were not available to Customers and that were material.  Defendants knew that their Products were defective through their manufacturing process and inspection they claimed they performed, however, Defendants concealed this information from Plaintiffs and Class members and shipped the Products anyway to Fashion Consultants for distribution and sale to Plaintiffs and Class members.  A reasonable purchaser would not anticipate that the Products were defective as there was no reason to believe as such. Plaintiffs and Customers are not actually made aware of the defective nature of the Products until after their purchase and receipt of them.

121.   Such acts and practices of Defendants, as described herein, constitute "fraudulent" business practices under California Business and Professions Code §§ 17200, *et seq.*, in that such conduct was and is likely to deceive reasonable consumers into believing Defendants' Products were suitable and fit for the ordinary purposes for which such goods are used.

122.   As a result of Defendants' fraudulent business practices, Plaintiffs have suffered injury in fact and a loss of money or property in terms of purchasing the Products that are unsuitable for their ordinary use as clothing, which they would not have purchased at the prices they paid had the true nature of the Products not been misrepresented or had the material facts been fully disclosed.

123.   Pursuant to Business and Professions Code § 17204, Plaintiffs and Class members are entitled to an order of this Court enjoining such conduct on the part of Defendants, and any other orders and judgments that may be necessary to provide for complete equitable monetary relief by disgorging Defendants' ill-gotten gains, including the monies Defendants received or saved as a result of its wrongful acts and practices detailed herein, and restoring to any person in interest such monies paid for Defendants' Products by ordering the payment of full restitution plus interest.  Otherwise, Plaintiffs and Class members may be irreparably harmed or denied an effective and complete remedy if such an order is not granted.

## COUNT III

### *Unlawful Business Practices*
(California Business & Professions Code § 17200, *et seq.*)
### *On Behalf of Plaintiffs, the National Class, and General Public*

124.   Plaintiffs incorporate and reallege by reference each and every allegation above as if fully set forth herein.

125.   A business act or practice is "unlawful" under the UCL if it violates any other law or regulation.

126.   Defendants' unlawful business practices and acts, as described herein, breached and continue to breach the implied warranty of merchantability, Cal. Com. Code

§ 2314(2)(c); the Consumers Legal Remedies Act, Cal. Civ. Code § 1770(a)(5), § 1770(a)(7), and § 1770(a)(9); California's False Advertising Law, Cal. Bus. & Prof. Code §§ 17500, *et seq.*; the Texas Deceptive Trade Practices Act, Tex. Bus. & Com. Code §§ 17.50(1), 17.50(3); and the Oregon Unlawful Trade Practices Act, ORS §§ 646.608(1)(e), (g), (i), and (t), as alleged herein, by manufacturing and selling Products that are unsuitable for normal use and the ordinary purposes for which the Products are used.

127.   Plaintiffs reserve the right to identify other violations of law as the facts develop.

128.   As a result of Defendants' unlawful business practices, Plaintiffs have suffered injury in fact and a loss of money or property in terms of purchasing the Products that are unsuitable for their ordinary use as coverage for legs.  Plaintiffs would not have purchased the Products, or at the price they paid, had they known the truth about the Products.

129.   Pursuant to Business and Professions Code § 17204, Plaintiffs and the Class are entitled to an order of this Court enjoining such conduct on the part of Defendants, and any other orders and judgments that may be necessary to provide for complete equitable monetary relief by disgorging Defendants' ill-gotten gains, including the monies Defendants received or saved as a result of its wrongful acts and practices detailed herein, and restoring to any person in interest such monies paid for Defendants' Products by ordering the payment of full restitution plus interest.  Otherwise, Plaintiffs and Class members may be irreparably harmed or denied an effective and complete remedy if such an order is not granted.

## COUNT IV

***Violation of the California False Advertising Law,***
(California Business & Professions Code Sections 17500, *et seq.*)
***On Behalf of Plaintiffs, the National Class, and the General Public***

130.   Plaintiffs incorporate and reallege by reference each and every allegation above as if fully set forth herein.

131.   California's False Advertising Law ("FAL") prohibits unfair, deceptive, untrue, or misleading advertising, including false statements as to worth, value, and former price.

132.   The FAL makes it unlawful for a business to disseminate any statement which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading.

133.   Defendants' practice of representing to the public, through their website, Fashion Consultants, and various social media handles and accounts, that they sold leggings is an unfair, deceptive or misleading advertising practice because it gave the false impression that the Products were suitable for providing coverage for legs.

134.   Defendants, with the intent to induce members of the public to purchase Products offered from the various Fashion Consultants, made or caused to be made each of the untrue or misleading statements, claims, or representations described herein.

135.   Defendants knew, or by the exercise of reasonable care should have known, that their claims were untrue, deceptive, or misleading.

136.   When Defendants made or caused to be made the untrue or misleading claims, statements, or misrepresentations described herein to consumers in California, Defendants failed to adequately disclose material facts pleaded herein, namely, that the Products were defective, did not provide coverage for legs, and were unsuitable for ordinary use.  Plaintiffs request that this Court cause Defendants to restore this money to Plaintiffs and all other respective Class members, and to enjoin Defendants from continuing to violate the FAL, or from violating the FAL in the future.  Otherwise, Plaintiffs, the Class they seek to represent, and members of the general public may be irreparably harmed and/or denied an effective and complete remedy if such an order is not granted.

## COUNT V

*Violation of the California Consumers Legal Remedies Act*
(California Civil Code § 1750, *et seq.*)
***On Behalf of Plaintiffs, the National Class, and the General Public***

137.   Plaintiffs incorporate and reallege by reference each and every allegation above as if fully set forth herein.

138.   Defendants, with the intent to induce members of the public to purchase their Products, made or caused to be made false or misleading claims to consumers throughout California and the United States.  Specifically, Defendants, through Fashion Consultants and their website, represented that they sold leggings, which by definition, provide coverage for the legs.  The leggings, however, did not provide coverage as they were sold with holes or developed holes shortly after use.

139.   Plaintiffs and Class members are "consumers" within the meaning of California Civil Code § 1761(d).

140.   Customers' purchases of Defendants' Products are "transactions" within the meaning of California Civil Code § 1761(e).

141.   The Products purchased by Plaintiffs and other Class members throughout the Class Period are "goods" within the meaning of California Civil Code § 1761(a).

142.   Defendants engaged in unfair methods of competition, or unfair or deceptive acts or practices against Plaintiffs and Class members in violation of the California Consumers Legal Remedies Act (the "CLRA"), by making false or misleading statements of fact concerning the quality of the Products and their ability to be used for the ordinary purposes for which such goods are used through the use of the word, "leggings" and images disseminated on their website and through their Fashion Consultants. Additionally, Defendants failed to disclose material facts that were within their exclusive knowledge, namely, the poor quality of the Products that they were not fit for their ordinary purposes of use, or for covering the legs.  Defendants did not disclose these material facts on the Products, on their website, or through their Fashion Consultants.

143. Defendants violated and continue to violate the CLRA by engaging in the following deceptive practices proscribed by the California Civil Code § 1770(a) that constitute transactions intended to result in, and that did result in, the sale of the Products herein to Plaintiffs and the Class:

      a.    Representing that the goods have characteristics, uses or benefits which they do not have (Cal. Civ. Code § 1770(a)(5));

      b.    Representing that the goods are of a particular standard, quality or grade if it is of another (Cal. Civ. Code § 1770(a)(7)); and

      c.    Advertising goods with the intent not to sell them as advertised (Cal. Civ. Code § 1770(a)(9)).

144. As described herein, by purchasing Defendants' Products, Plaintiffs and the Class suffered damage by the wrongful acts and practices of Defendants, in violation of California Civil Code § 1781. Absent these acts or practices, Plaintiffs and Class members would not have purchased Defendants' Products.

145. Pursuant to California Civil Code § 1780(a)(2), Plaintiffs, on behalf of themselves and all Class members, request that this Court enjoin Defendants from continuing to engage in the unlawful and deceptive methods, acts or practices alleged herein. Unless Defendants are permanently enjoined from continuing to engage in such violations of the CLRA, consumers will continue to be harmed by Defendants' acts or practices in the same way as those acts or practices have harmed Plaintiffs and Class members.

146. Plaintiffs provided notice to Defendants of the alleged violations of the CLRA and the UCL in compliance with Cal. Civ. Code § 1782(a). Plaintiffs now seek damages on behalf of themselves and all others similarly situated and all other appropriate relief.

## COUNT VI

### *Violation of Texas Deceptive Trade Practices Act*
(Tex. Bus. & Com. Code § 17.50, *et seq.*)
### *On Behalf of Plaintiff Benjamin and the Texas Subclass*

147.  Plaintiff Benjamin incorporates by reference and realleges all paragraphs previously alleged herein.

148.  Plaintiff Benjamin and each member of the Texas Subclass is a "consumer" as defined in the Texas Deceptive Trade Practices Act ("DTPA").

149.  By making false or misleading statements of fact concerning the quality of the Products and their ability to be used for the ordinary purposes for which such goods are used through the use of the word "leggings" and images disseminated on their website and through their Fashion Consultants and by failing to disclose material facts that were within their exclusive knowledge, namely, the poor quality of the Products and that they were not fit for their ordinary purposes of use, Defendants violated the following provisions of the DTPA:

    (a) Tex. Bus. & Com. Code § 17.50(1): the use or employment of a false, misleading, or deceptive acts or practices as defined in § 17.46(b)(5), § 17.46(b)(7), § 17.46(b)(9), § 17.46(b)(20), and § 17.46(b)(24) of the DTPA that were detrimentally relied upon by Plaintiff Benjamin and each member of the Texas Subclass; and

    (b) Tex. Bus. & Com. Code § 17.50(3): an unconscionable action or course of action as defined by § 17.45(5).

150.  Defendants' violations of the DTPA were committed knowingly and intentionally as those terms are defined in § 17.45(9) and § 17.45(13) of the DTPA.

151.  Defendants' conduct was a producing and/or proximate cause of actual damages to Plaintiff Benjamin and each member of the Texas Subclass.

152.  Plaintiff Benjamin and Texas Subclass members demand judgment against Defendants for compensatory damages in an amount to be determined at trial (Plaintiff

Benjamin and Texas Subclass members will seek treble damages for the intentional and knowing conduct of Defendants), together with reasonable attorneys' fees and costs.

## COUNT VII

### *Violation of the Oregon Unlawful Trade Practices Act*
(Oregon Revised Statute § 646.605, *et seq.*)
### *On Behalf of Plaintiff Doran and the Oregon Subclass*

153.   Plaintiff Doran incorporates by reference and realleges all paragraphs previously alleged herein.

154.   Plaintiff Doran, each member of the Oregon Subclass, and Defendants are "person[s]" as defined in the Oregon Unlawful Trade Practices Act ("UPTA").  ORS § 646.605(4).

155.   The UPTA prohibits the following business practices: "(e) [r]epresent[ing] that . . . goods . . . have . . . characteristics . . . uses, benefits, . . . or qualities that they do not have; (g) [r]epresent[ing] that . . . goods . . . are of a particular standard [or] quality . . . if they are of another; (i) [a]dvertis[ing] . . . goods . . . with intent not to provide the . . . goods . . . as advertised;" and (t) . . . fail[ing] to disclose any known material defect or material nonconformity."  ORS § 646.608(1).

156.   Defendants' were engaged in and committed the unlawful acts alleged herein in the course of "trade" or "commerce" within the meaning of ORS § 646.605(8).

157.   Defendants' Products are "good[s]" within the meaning of ORS § 646.605(6).

158.   Defendants violated the UPTA by engaging in reckless and unlawful practices in the course of their business by, as alleged herein, representing that their Products have characteristics, uses, benefits, and qualities which they do not have; representing that the Products are of a particular standard and quality when they are not; advertising the Products with the intent not to sell them as advertised; and failing to disclose and omitting from its labeling, advertising, and marketing materials material information regarding the defective nature of the Products and that the Products are not suitable for the ordinary purpose for which the Products are used.  Further, Defendants

authorized the Fashion Consultants to use images which misrepresented the quality and suitability of the Products to potential Customers and Class members.

159.    Defendants' unlawful and reckless practices, including the concealment, omission, and suppression of material facts regarding the Products, were directed at consumers and had a tendency or capacity to mislead and create a false impression in consumers in violation of the UPTA.

160.    Defendants knew or should have known of the falsity of their representations and their omissions at all material times.

161.    Plaintiff Doran and the Oregon Subclass did in fact detrimentally rely upon Defendants' misrepresentations and/or omissions regarding the suitability of the Products and were deceived into purchasing defective Products that were not fit for the ordinary purpose of use.

162.    As a direct and proximate result of Defendants' violations of the UPTA, Plaintiff Doran and the members of the Oregon Subclass have suffered injury and incurred actual damage, including the cost of purchasing the defective Products.

163.    Plaintiff Doran and the Oregon Subclass are entitled to recover the greater of actual damages or $200, pursuant to ORS § 646.638(1).  Plaintiff Doran and the Oregon Subclass are also entitled to punitive damages because Defendants engaged in reckless conduct amounting to a particularly aggravated, deliberate disregard of the rights of others.  Plaintiff Doran and the Oregon Subclass are further entitled to injunctive relief to enjoin Defendants from continuing to engage in the unlawful and deceptive methods, acts or practices alleged herein, and further relief as the Court may be deemed necessary or appropriate.

## COUNT VIII

### *Breach of Implied Warranty of Merchantability*
### *On Behalf of Plaintiffs, the National Class, and the State Subclasses*

164.   Plaintiffs incorporate by reference and reallege all paragraphs previously alleged herein.

165.   Every sale of consumer goods that are sold at retail are accompanied by the manufacturer's and the retail seller's implied warranty that the goods are merchantable, and specifically, that the goods are fit for the ordinary purposes for which such goods are used.

166.   "Defendants" are "manufacturers" and "retail sellers," and the Products Defendants sold are "consumer goods."

167.   Defendants expressly and impliedly warranted to Plaintiffs and Class members that the Products were merchantable and fit for use as clothing for wearing and covering based on the advertising, marketing, and sale of the Products as alleged herein.

168.   Defendants knew the Products were not merchantable in that they were not reasonably fit for the ordinary purposes for which they were manufactured and sold, namely, wearing and covering.  Specifically, the Products disintegrated and developed small holes which turned into larger holes and no longer provided covering as intended or were suitable for wear in public.  Other legging Products had one leg that was shorter or larger than the other, in addition to completely inconsistent sizing.  The Products were not sold "as is" nor as "with all faults."

169.   Defendants were repeatedly put on notice of these issues through thousands of Customer complaints, including through the Better Business Bureau as early as January 2016.  Despite receiving notice from their Customers of these claims requesting that they resolve the complaints, Defendants have not provided adequate remedies to Plaintiffs and Class members.

170.   The exception to any applicable vertical privity requirement applies here. Plaintiffs and Class members are intended third party beneficiaries of Defendants'

arrangements with Fashion Consultants.  Defendants enter into contracts with the Fashion Consultants with the intention that the Fashion Consultants become Defendants' authorized and exclusive sellers of Defendants' Products to Plaintiffs and Class members. The cost to become a Fashion Consultant is significant; therefore individuals do not become Fashion Consultants to obtain a discount.

171.   By entering into contracts with Fashion Consultants, Defendants have given them express and exclusive authority to sell and market their Products to Plaintiffs and Class members as "leggings."  Defendants do not sell their Products by any other means. Plaintiffs and Class members bought the Products from Defendants' authorized dealers— the Fashion Consultants.  Defendants authorize Fashion Consultants to use Defendants' Product images, trademarks, and the LuLaRoe name for purposes of selling and marketing the Products to Plaintiffs and Class members.  Additionally, Defendants provide a pricing structure for the Fashion Consultants to price the Products that they sell to Plaintiffs and Class members.  Additionally, Plaintiffs' and Class members' transactions are processed through Defendants' point of sale systems, and Defendants collect the personal information and purchase records, including payment information, of Plaintiffs and Class members.

172.   Because the Products are used by Customers, as intended by Defendants, and such warranties are either expressly made through advertising and statements made by Defendants or are implied by law in all consumer transactions, Plaintiffs and Class members who purchased the Products are third party beneficiaries and are entitled to incidental and compensatory damages directly from Defendants.

## COUNT IX

### *Unjust Enrichment*
### *On Behalf of Plaintiffs, the National Class, and the State Subclasses*

173.   Plaintiffs incorporate and reallege by reference each and every allegation above as if fully set forth herein.

174.   Plaintiffs and Class members conferred benefits on Defendants by purchasing the Products.

175.   Defendants have been unjustly enriched in retaining the revenues derived from Plaintiffs' and Class members' purchases of the defective Products that were not fit for the ordinary purposes for which they are used.  Retention of those monies under these circumstances is unjust and inequitable because Defendants misrepresented the availability of leggings and that Products were fit for the purpose for which the Products are used.  These misrepresentations caused injuries to Plaintiffs and Class members because they would not have purchased the Products if the true facts had been known.

176.   Because Defendants' retention of the benefits conferred on them by Plaintiffs and Class members is unjust and inequitable, Defendants must pay restitution to Plaintiffs and Class members for their unjust enrichment, as ordered by the Court.

## COUNT X

### *Breach of Implied Warranty in Tort*
### *On Behalf of Plaintiff Goodwin and the Ohio Subclass*

177.   Plaintiffs incorporate and reallege by reference each and every allegation above as if fully set forth herein.

178.   Defendants' leggings are defective.

179.   The fabric of the leggings is so "soft" that it tears from ordinary use, and in some instances, before it is even removed from the package.

180.   Plaintiff Goodwin bought Defendants' leggings.

181.   Plaintiff Goodwin is not in privity with Defendants.

182.   Plaintiff Goodwin's LuLaRoe leggings had holes in them when she removed them from the package.

183.   Plaintiff requested a refund, but was told by the Fashion Consultant that Defendants did not offer refunds for defective Products.

184.   The defect in the LuLaRoe leggings was present when the leggings left the hands of Defendants.

185.   This defect was the direct and proximate cause of injury to Plaintiff Goodwin and the Ohio Subclass.

186.   As a direct and proximate result of Defendants' breach of warranty, Plaintiff and the other Class members were caused to suffer loss attributable to the purchase of the defective Product.

## COUNT XI

### Breach of Express Warranty Under the UCC
### On Behalf of Plaintiff Goodwin and the Ohio Subclass

187.   Plaintiffs incorporate and reallege by reference each and every allegation above as if fully set forth herein.

188.   This cause of action is plead in the alternative to the Tenth Claim for Relief (Breach of Implied Warranty in Tort).

189.   Defendants made specific descriptions of the goods as well as affirmations of fact and promises in the form of marketing representations about the leggings, as stated above.

190.   The affirmations of fact made by Defendants were made to induce Plaintiff and Class members to purchase the Products.

191.   Plaintiff and Class members relied on Defendants' affirmations in purchasing the Products.

192.   All conditions precedent to Defendants' liability under the warranty have been performed by Plaintiff and Class members or have been waived.

193.   Defendants knew there were problems with the leggings.  Once again, Defendants' head of production has stated that "the leggings may get holes because we weaken the fibers to make them buttery soft and that we have done all we can to fix them. The best solution would be to no longer use the brushing technique.  But then they're not buttery soft."

194.   Defendants breached the terms of the express warranty because the Products did not conform to the description provided by Defendants, to wit: Defendants'

acknowledged "special brushing" manufacturing and processing technique used to make the leggings "buttery soft" actually weakens the fibers in these leggings, causing them to rip, tear, and form holes nearly immediately.

195.   As a result of Defendants' breach of warranty, Plaintiff and Class members have been damaged in the amount to be determined according to proof at the time of trial.

### COUNT XII

### *Fraud*
### *On Behalf of Plaintiff Goodwin and the Ohio Subclass*

196.   Plaintiffs incorporate and reallege by reference each and every allegation above as if fully set forth herein.

197.   Defendants represented through their website and Fashion Consultants that they sold LuLaRoe branded leggings and that their LuLaRoe leggings could be worn in the presence of others.

198.   For example, at www.lularoe.com/adult-legging/, Defendant stated with respect to LuLaRoe leggings: "They're as close to your own skin as you can get with all of the perks of, ahem, not being naked.  You can sport them at your favorite Pilates class or throw on some cute booties, and wear them out for a girls night! Your LuLaRoe leggings will be a great statement piece wherever you are!"

199.   Plaintiff and the Class members purchased the LuLaRoe leggings based on the representation that the leggings were appropriate to wear around others.

200.   The representation that the LuLaRoe leggings could be worn around others was material to the purchase decisions of Plaintiff and the Class.

201.   If Plaintiff and Class members had known that a defect in the leggings would cause them to tear, making them inappropriate for wearing around others, they would not have purchased them.

202.   Defendants knew that their representations about the leggings were false, and that, in fact, the material of the leggings was too "soft" and was likely to tear.

203.   Defendants intended for Plaintiff and Class members to rely on the representation that the leggings were fit to wear around others.

204.   Plaintiff and the Class justifiably relied upon that representation.

205.   Plaintiff and the Class members' reliance on Defendants' false representation was the proximate cause of their injuries.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs and the Class demand judgment against Defendants as follows:

A.   An order certifying that this action may be maintained as a class action, that Plaintiffs be appointed Class Representatives and Plaintiffs' counsel be appointed Class Counsel;

B.   A judgment awarding Plaintiffs and all members of the Class damages as alleged above incurred by Plaintiffs and Class members as a result of Defendants' unlawful, deceptive, unfair, and fraudulent business and trade practices described herein;

C.   A judgment awarding Plaintiffs and all members of the Class restitution or other equitable relief, including, without limitation, disgorgement of all profits and unjust enrichment that Defendants obtained from Plaintiffs and the Class as a result of their unlawful, unfair, and fraudulent business practices described herein;

D.   An order enjoining Defendants from continuing to violate the laws as described herein;

E.   A judgment awarding Plaintiffs the costs of suit, including reasonable attorneys' and experts' fees, and pre and post-judgment interest; and

F.   Such other and further relief as may be deemed necessary or appropriate.

1

**JURY DEMAND**

2

Plaintiffs hereby demand a trial by jury.

3

Dated: February 16, 2018                    **LEVI & KORSINSKY, LLP**

4

By: /s/ *Rosemary M. Rivas*
Rosemary M. Rivas

5

Quentin A. Roberts
6          44 Montgomery Street, Suite 650
San Francisco, CA 94104
7          Telephone: (415) 291-2420
Facsimile: (415) 484-1294

8

*Interim Lead Counsel for Plaintiffs and*
9          *the Proposed Class*

10         **CASEY GERRY SCHENK FRANCAVILLA**
**BLATT & PENFIELD, LLP**
11         Gayle M. Blatt
110 Laurel Street
12         San Diego, CA 92101
Telephone: (619) 238-1811
13         Facsimile: (619) 544-9232
Email: gmb@cglaw.com

14

**FARUQI & FARUQI, LLP**
15         Timothy J. Peter
101 Greenwood Avenue, Suite 600
16         Jenkintown, PA 19046
Telephone: (215) 277-5770
17         Facsimile: (215) 277-5771
Email: tpeter@faruqilaw.com

18

**DWORKEN & BERNSTEIN CO., L.P.A.**
19         Patrick J. Perotti
1468 W. 9th Street, Suite 135
20         Cleveland, OH 44113
Telephone: (440) 946-7656
21         Facsimile: (440) 352-3469
Email: pperotti@dworkenlaw.com

22

*Executive Committee for Plaintiffs and the*
23         *Proposed Classes*

24

25

26

27

28