**FARUQI & FARUQI, LLP**
Benjamin Heikali (State Bar No. 307466)
Email: *bheikali@faruqilaw.com*
Joshua Nassir (State Bar No. 318344)
Email: *jnassir@faruqilaw.com*
10866 Wilshire Boulevard, Suite 1470
Los Angeles, California 90024
Telephone: (424) 256-2884
Facsimile: (424) 256-2885

**GIBBS LAW GROUP**
Rosemary Rivas (State Bar No. 209147)
Email: *rmr@classlawgroup.com*
505 14th Street, Suite 1110
Oakland, CA 94612
Telephone: (510) 350-9700
Facsimile: (510) 350-9701

# UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

TANYA MACK; SUZANNE JONES; CAITLIN GOODWIN, MINA NICOLLE ULASZEK BENJAMIN; and TERRI DORAN, on behalf of themselves and all others similarly situated,

Plaintiffs

v.

LLR, INC. and LULAROE, LLC,

Defendants.

Case No. 5:17-cv-00853-JGB-SHK

ASSIGNED FOR ALL PURPOSES TO HON. JESUS G. BERNAL

Consolidated With:
    2:17-cv-07252-JGB(AFMx)
    2:17-cv-07259-JGB(Ex)
    2:17-cv-07308-JGB(AFMx)
    2:17-cv-07310-JGB(Ex)

**REDACTED PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR A DETERMINATION THAT THEY ARE SUCCESSFUL PARTIES PURSUANT TO CAL. CIV. P. CODE § 1021.5; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION**

Date: April 12, 2021
Time: 9:00 A.M.
Place: Courtroom 1

Case No. 5:17-cv-00853-JGB-SHK
NOTICE OF MOTION AND MOTION

**PLEASE TAKE NOTICE** that, on April 12, 2021, at 9:00 am, or as soon thereafter as the Court is available, in Courtroom 1 of the federal courthouse located at 3470 Twelfth Street  Riverside, CA  92501-3801, Plaintiffs Tanya Mack ("Mack"), Suzanne  Jones ("Jones"), Caitlin Goodwin ("Goodwin"), Mina Nicolle Ulaszek Benjamin ("Benjamin"), and Terri Doran ("Doran") (collectively, "Plaintiffs") will and hereby do move this Court for a determination that they are successful parties pursuant to Cal. Civ. P. Code § 1021.5 (the "Motion").

Plaintiffs' Motion is based on this Notice of Motion, the attached Memorandum of Points and Authorities, the Declaration of Rosemary Rivas in Support of the Notice of Motion and Motion, the exhibits submitted in support thereof, and any additional evidence or briefing on this subject that may be requested by this Court.

This Motion is filed following a conference of counsel pursuant to Local Rule 7-3, which occurred on January 25, 2021. *See* Declaration of Rosemary M. Rivas ¶ 42.  The parties conferred regarding Plaintiffs' intended motion and were unable to obviate the need for this Motion.

Date: March 8, 2021                              Respectfully submitted,


                                                 */s/ Benjamin Heikali*


                                                 **FARUQI & FARUQI, LLP**
                                                 Benjamin Heikali (State Bar No. 307466)
                                                 Email:  *bheikali@faruqilaw.com*
                                                 Joshua Nassir (State Bar No. 318344)
                                                 Email:  *jnassir@faruqilaw.com*
                                                 10866 Wilshire Boulevard, Suite 1470
                                                 Los Angeles, California 90024
                                                 Telephone: (424) 256-2884
                                                 Facsimile: (424) 256-2885


                                                 Case No. 5:17-cv-00853-JGB-SHK
NOTICE OF MOTION AND MOTION

# TABLE OF CONTENTS

I.      INTRODUCTION ...................................................................................................1

II.     FACTUAL & PROCEDURAL BACKGROUND........................................................2

    A.    Defendants Ignored Complaints About Defective Leggings .........................2

    B.    The Filing of the Lawsuits Beginning on March 23, 2017 ...........................5

    C.    Changes Made to the Leggings' Design and Production Process, Quality Control, and Return Policies After the Lawsuits were Filed .........................6

        1.   Plaintiffs' Experts' Opinions About the Defective Leggings...............6

        2.   Sworn Testimony and Documentary Evidence About the Production Process and Changes Thereto ...................................7

        3.   Changes in Quality Control Measures ...................................................8

        4.   The Lawsuits Motivated LuLaRoe to Issue Cash Refunds .................9

III.    PLAINTIFFS ARE ENTITLED TO ATTORNEYS' FEES AND COSTS UNDER CALIFORNIA CODE OF CIVIL PROCEDURE § 1021.5 ...................10

    A.    The Legal Standard Under California Code of Civil Procedure § 1021.5....10

    B.    Plaintiffs Are "Successful Parties" Under Section 1021.5 ...........................11

        1.   Plaintiffs' Primary Relief Sought Has Been Obtained ......................12

        2.   This Lawsuit Had Merit and Was the Catalyst for LuLaRoe's Changes .................................................................................14

        3.   Plaintiffs' Lawsuit Was Not "Frivolous, Unreasonable, or Groundless"...............................................................................15

        4.   Plaintiffs Reasonably Attempted to Settle Before Litigating .............16

    C.    Plaintiffs Have Conferred Significant Benefits.............................................19

    D.    Plaintiffs Enforced an Important Right Affecting the Public Interest .........19

    E.    The Necessity and Financial Burden of Private Enforcement Makes the Award Appropriate.......................................................................20

        1.   Private Enforcement was Necessary ....................................................20

        2.   Plaintiffs Meet the Financial Burden Prong .......................................20

            a.   The Monetary Value Of The Benefits.......................................21

            b.   The Value Of The Individual Stakes Is Discounted By The Probability Of Success..................................................22

i        Case No. 5:17-cv-00853-JGB-SHK
MEMORANDUM OF POINTS AND AUTHORITIES

c.    The Discounted Values Of The Individual Stakes Are Far Outweighed By Plaintiffs' Fees And Costs ............................. 23

IV.    IN THE ALTERNATIVE THE COURT MAY GRANT ATTORNEYS' FEES BASED ON THE COMMON FUND DOCTRINE ................................................. 24

V.    CONCLUSION ................................................................................................. 25

MEMORANDUM OF POINTS AND AUTHORITIES

# TABLE OF AUTHORITIES

**Cases**                                                                                                           **Page(s)**

*AdTrader, Inc. v. Google LLC*,
  No. 17-CV-07082-BLF, 2020 WL 1921774 (N.D. Cal. Mar. 24, 2020) ...............24, 25

*Beasley v. Wells Fargo Bank, N.A.*,
  235 Cal. App. 3d 1407 (1991) ...................................................................22, 23, 24

*Bentley v. United of Omaha Life Ins. Co.*,
  No. CV 15-7879-DMG, 2020 WL 3978090 (C.D. Cal. Mar. 13, 2020) ......................22

*Bottoni v. Sallie Mae, Inc.*,
  No. C 10-03602 LB, 2013 WL 12312794 (N.D. Cal. Nov. 21, 2013) .........................24

*Californians for Responsible Toxics Mgm't v. Kizer*,
  211 Cal. App. 3d 961 (1989) ..................................................................................11

*Cates v. Chiang*,
  213 Cal. App. 4th 791 (2013) ...................................................................17, 18, 19, 23

*City of Oakland v. Oakland Police & Fire Ret. Sys.*,
  29 Cal. App. 5th 688 (2018) ..............................................................................23, 24

*Colgan v. Leatherman Tool Grp., Inc.*,
  135 Cal. App. 4th 663 (2006) ................................................................................19

*In re Conservatorship of Whitley*,
  50 Cal. 4th 1206 (2010) ....................................................................................20, 21

*Edwards v. Ford Motor Co.*,
  727 F. App'x 233 (9th Cir. 2018) ..........................................................................11

*Edwards v. Ford Motor Co.*,
  No. 11CV1058-MMA (BLM), 2016 WL 1665793 (S.D. Cal. Jan. 22, 2016) ........19, 21

*Evans v. DSW, Inc.*,
  No. 2:16-cv-03791 JGB, 2018 WL 6920674 (C.D. Cal. Aug. 17, 2018)...............*passim*

*Graham v. DaimlerChrysler Corp.*,
  34 Cal. 4th 553 (2004) ...................................................................................*passim*

MEMORANDUM OF POINTS AND AUTHORITIES

*Henderson v. J.M. Smucker Co.*,
   No. CV 10-4524-GHK, 2013 WL 3146774 (C.D. Cal. June 19, 2013) ................. *passim*

*Hogar v. Cmty. Dev. Comm'n of the City of Escondido*,
   157 Cal. App. 4th 1358 (2007) ..................................................................... 10

*Indep. Living Ctr. of S. Cal., Inc. v. Kent*,
   909 F.3d 272 (9th Cir. 2018) ....................................................................... 25

*Indep. Living Ctr. of S. Cal. v. Kent*,
   No. 2:08-cv-03315-CAS-MANx, 2019 WL 3717793 (C.D. Cal. Aug. 6, 2019) .......... 20

*Karuk Tribe of N. Cal. v. Cal. Reg. Water Quality Control Bd.*,
   183 Cal. App. 4th 330 (2010) ..................................................................... 14

*Klein v. City of Laguna Beach*,
   810 F.3d 693 (9th Cir. 2016) ..................................................................... 10

*L.A. Police Protective League v. City of L.A.*,
   188 Cal. App. 3d 1 (1986) ......................................................................... 22

*MacDonald v. Ford Motor Co.*,
   142 F. Supp. 3d 884 (N.D. Cal. 2015) .................................................... *passim*

*Parkinson v. Hyundai Motor Am.*,
   796 F. Supp. 2d 1160 (C.D. Cal. 2010) ....................................................... 10

*Robinson v. City of Chowchilla*,
   202 Cal. App. 4th 382 (2011) ..................................................................... 20

*Saint John's Organic Farm v. Gem Cty. Mosquito Abatement Dist.*,
   574 F.3d 1054 (9th Cir. 2009) ............................................................. 12, 13

*Shvager v. ViaSat, Inc.*,
   No. CV 12-10180 MMM, 2014 WL 12585790 (C.D. Cal. Mar. 10, 2014) ................. 20

*Skinner v. Ken's Foods, Inc.*,
   53 Cal. App. 5th 938 (2020) ....................................................................... 15

*Sweetwater Union High Sch. Dist. v. Julian Union Elementary Sch. Dist.*,
   36 Cal. App. 5th 970 (2019) ....................................................................... 13

*In re Taco Bell Wage & Hour Actions*,
   222 F. Supp. 3d 813 (E.D. Cal. 2016) ................................................... 14, 15

MEMORANDUM OF POINTS AND AUTHORITIES

*Thomas v. Kent*,
    No. CV 14-8013 FMO, 2019 WL 2590170 (C.D. Cal. May 30, 2019) .................. 12, 15

*Tipton-Whittingham v. City of L.A.*,
    34 Cal. 4th 604 (2004) ........................................................................................... 11, 15

*Tourgeman v. Nelson & Kennard*,
    222 Cal. App. 4th 1447 (2014) .................................................................................... 24

*Vincent v. Hughes Air W., Inc.*,
    557 F.2d 759 (9th Cir. 1977) ....................................................................................... 25

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*,
    914 F.3d 623 (9th Cir. 2019) ....................................................................................... 25

*Wilson v. TE Connectivity Networks, Inc.*,
    No. 14-cv-04872-EDL, 2019 WL 4242939 (N.D. Cal. Sept. 6, 2019) ........................ 25

*Woodland Hills Residents Ass'n, Inc. v. City Council of L.A.*,
    23 Cal. 3d 917 (1979) .................................................................................................. 21

v          Case No. 5:17-cv-00853-JGB-SHK
MEMORANDUM OF POINTS AND AUTHORITIES

## I.    **INTRODUCTION**

LuLaRoe clothing is not sold in retail stores or through the company website but only through consultants who were lured into paying Defendants LLR, Inc. and LuLaRoe, LLC ("Defendants" or "LuLaRoe") between $5,000-$9,000 upfront for clothing, sight unseen, with promises that they could make a lot of money (anywhere from $10,000-$500,000 a month) by working part-time.[1]  According to the Washington State Attorney General, LuLaRoe operated an illegal pyramid scheme where consultants received bonuses based on the inventory they and their recruits bought, rather than on selling clothing to consumers for personal use.[2]  *See* Ex. 2.  Moreover, the top consultants reported receiving bonuses that were seven to twelve times more than sales.  This structure incentivized consultants to recruit more retailers to make inventory purchases rather than sell clothing to consumers for personal use.

As detailed below, LuLaRoe's primary focus was on selling as many onboarding packages as possible and thus, showed little regard for the quality of the clothing it sold, which consumers described as "garbage."  LuLaRoe ignored scores of complaints by consultants and end-consumers about defective leggings (the "Leggings") that shredded or developed holes before wearing or after little wear and that had sizing problems. Before these consumer class actions were brought, LuLaRoe refused to make changes to the production process, even those recommended by its supplier, and strictly adhered to a "no refund policy" when consumers complained, instead directing them to the consultants for an exchange.  LuLaRoe, however, did not provide consultants with refunds, and instead only gave them wholesale credits for future purchases of clothing, which deterred consultants from issuing refunds to consumers.

---

[1] *See* Ex. 1 to the accompanying Declaration of Rosemary M. Rivas ("Rivas Decl.").  All references to "Ex." are to the exhibits attached to the Rivas Decl., unless otherwise noted.

[2] On the eve of trial, Defendants settled the pyramid scheme action with the Washington State Attorney General for $4,750,000.00.  Press Release, Wash. State Office of the Att'y Gen., LuLaRoe to Pay $4.75 Million to Resolve AG Ferguson's Lawsuit Over Pyramid Scheme (Feb. 2, 2021), *https://www.atg.wa.gov/news/news-releases/lularoe-pay-475-million-resolve-ag-ferguson-s-lawsuit-over-pyramid-scheme*.

Not until after the filing of this lawsuit, and in direct response thereto, did LuLaRoe change its return policies and provide cash refunds and exchanges to consumers, providing a total value of more than ████████ to consumers.  Moreover, LuLaRoe made concrete changes to the leggings production process after this lawsuit was filed, resulting in leggings that have passed strength tests commissioned by Plaintiffs. Finally, LuLaRoe's own expert testified that the company has implemented quality control measures consistent with industry practice, which have been verified by internal documents prepared during the lawsuit. *See* Section II.C, *infra*.

As explained below, Plaintiffs' lawsuit was the catalyst that created essentially a common fund to consumers and resulted in the changes that they sought from the outset of the lawsuit.  Thus, Plaintiffs are the "successful party" under Cal. Civ. P. Code § 1021.5 for the reasons set forth below and an award of attorneys' fees is appropriate. In the alternative, and as further set forth below, Plaintiffs request a fee under the common fund doctrine.  Accordingly, Plaintiffs respectfully request that the Court grant this motion and set a deadline by which they shall file a motion for incentive awards and attorneys' fees and expenses with a detailed explanation of the work they performed, their hourly rates, and detailed expenses, among other things.

## II.    FACTUAL & PROCEDURAL BACKGROUND

### A.    Defendants Ignored Complaints About Defective Leggings

Discovery has shown that beginning in 2016, consumers repeatedly complained to LuLaRoe, the Better Business Bureau and on social media about defective leggings that—while supposedly new—developed holes and tears before wearing or after little wear.  The following complaint from Vanessa T. in May 2016 typifies the anger and frustration customers felt:

> [A]fter finally agreeing and spending $25+ shipping for my 1st pair of leggings, I wore them successfully yesterday.  I decided to wear them under a dress this morning, & as I put them on, they ripped! I now have a big hole in my leggings, right below my knee! LuLaRoe, if I wanted to buy 'pantyhose' that I only got one wear out of, I would have gone to Walmart and paid $6 for

them . . . I could have spend [sic] my $25 on other things. This isn't the consultants' fault[.]

Ex. 3 at LLRMK0000258347.

Vanessa T. was not the only one who complained about the quality of the leggings. For example, Karin G. reported that her leggings disintegrated shortly after wearing them for the first time. She complained, "I wore them for maybe 45 minutes and they completely came apart in the crotch . . . . I mean they completely disintegrated." *Id.* at LLRMK000000013. Ashley A. had a similar experience with multiple leggings and wrote "I wore my new pair just like I would any other day and they ripped. Like toilet paper." *Id.* at LLRMK0000000113-14. Karley M. experienced the same thing: "I have had around 4 or 5 pairs of my leggings rip after the first wear. . . . Now I have had replacement pairs of leggings rip." *Id.* at LLRMK0000000120. And Karen F. similarly said: "I have had at least 11 pairs of ripped leggings that were worn either for just hours or once." *Id.* at LLRMK0000000020. Martha M. saw significant holes an hour after wearing them and while walking around Disneyland. She wrote: "…within an hour of putting on my new leggings I drove to Disneyland to spend the day there with my son and my friend and my leggings had a giant hole exposing half my butt. . . . I have had 5 pairs get holes now." *Id.* at LLRMK0000253562.

In late 2016, Ms. Julie Dean, a former customer frustrated with LuLaRoe's practices, tried reaching out to the company twice to obtain a refund. Ex. 4 ¶ 7. After being denied a refund both times, in the fall of 2016, Ms. Dean created a Facebook group called "LuLaRoe Defective/Ripped/Torn Leggings And Clothes" that had tens of thousands of members. *Id.* ¶ 8. Angry consumers complained on almost a daily basis about defective leggings and posted photos. *Id.* Attached as Ex. 5 to the accompanying Rivas Declaration are photos showing the defective leggings women complained about.

The defective leggings were also concerning for consultants and their businesses. Deanna B., a single mother of two babies, implored LuLaRoe to fix their defective products: "please fix the legging hole problem. It's embarrassing to work so hard to sell something

only to have it be defective." Ex. 6 at LLRMK0000363667. Similarly frustrated, Shannon C. in September 2016 wrote:

> I'm literally in tears right now. I just started lualroe [*sic*] 3 weeks ago. . . I have had 11 people that I've sold to have holes in their leggings the first time they wear them. I've replaced so many I'm almost out and two pairs I took for myself both got holes. I don't know what to do. I'm terrified to sell them because I can't replace them all and I'm embarrassed.

*Id.* at LLRMK0000362891.

> Myra K. in January 19, 2017 wrote:
>
> [I] have purchased $23k in inventory, and I am regretting my decision since you refuse to address the quality issue.  Instead, the messaging is to "get over it" and to "think like a retailer" and expect damages. . . . Well I am here to tell you that I am done with the positivity speeches.  Since you are constantly issuing consultant challenges, here is mine to you: stop hiding behind the positivity shield and get in front of the issue. If that means shutting down a subpar factory and/or manufacturing less leggings, do it.

*Id.* at LLRMK0000827504.

Unfortunately, the complaints fell on deaf ears.  For example, on February 8, 2017, about a month before this case started, a LLR employee wrote the following to Pam W. who complained about holes: "Our leggings go through a special brushing process to make them buttery soft.  We have found that during this process, the fibers on the leggings have weakened and result in holes." Ex. 7. Although acknowledging that LuLaRoe was selling leggings that tore or developed holes, pursuant to company policy, Pam W. was directed back to the consultant for an exchange, but not a refund.  *Id.* Frustrated, Pam W. wrote: "My retailer has already refused to do anything . . . so what do I do now?" *Id.* Mark Stidham, CEO and founder, confirmed that directing customers back to consultants was company policy in 2016 and early 2017.  Ex. 8 at 147:13-149:1; Ex. 9.

The lack of integrity, leadership and responsibility started at the top.  According to the sworn testimony of Plaintiff Suzanne Jones (who was a consultant for a brief time), the founders instructed consultants to simply sew any leggings that had holes. Ex. 10 at 162:2-4 ("DeAnne has said on the webinar that, 'If you get something with a hole in it, just sew

MEMORANDUM OF POINTS AND AUTHORITIES

it up and sell it.'"). And when consumers complained directly to DeAnne Brady Stidham, one of the founders, she was indifferent:

> "Wow I'll be happy to help you but your attitude is coming across negative and I don't blame you but when you are kind you'll get more results! I am happy to replace your leggings with new ones *this time* but remember, *the fabric is soft and usually wears only about 3-5 times like nylons or panty hose.*"

Ex. 11 (emphasis added).

### B.      The Filing of the Lawsuits Beginning on March 23, 2017

This consolidated lawsuit began as five separate, proposed class action cases that were filed beginning on March 23, 2017.[3]  Before filing the first case—the Dean Action— Ms. Dean reached out to LuLaRoe by telephone on two separate occasions and was denied a refund.  Ex. 4 ¶ 7.  And before filing the Mack Action, Plaintiffs Mack and Benjamin served LuLaRoe with pre-suit demand letters on April 28, 2017 and May 1, 2017, respectively. Ex. 12 at 1-4; Ex. 13 ¶ 3, Ex. 1.  LuLaRoe rebuffed Plaintiffs' attempts to negotiate relief on behalf of all similarly situated consumers and claimed, *inter alia*, that the leggings were not defective.  Ex. 12 at 6-12; *see also* Ex. 13 ¶¶ 4-9; Ex. 13 at Ex. 2.

The Dean Action alleged that Defendants sold defective leggings that tore, ripped or developed holes, were too small and had inconsistent measurements.  Dean Action, Compl. ¶¶ 8-9.  Further, the Dean Action alleged that Defendants "will neither issue refunds or make exchanges for [consumers]" who bought defective leggings that ripped or developed holes or were too small.  *Id.* ¶ 12.  The Dean Action also alleged that Defendants directed that any request pertaining to returns, damages, or shipping should go to the original consultant (*id.* ¶ 49).  The Dean Action prayed for both monetary and injunctive relief. Dean Compl. ¶ 1, Prayer for Relief B, D.

---

[3] *Dean, et al. v. LuLaRoe, Inc., et al.*, Case No. 17-cv-01579 (N.D. Cal.) (filed Mar. 23, 2017) ("Dean Action"); *Goodwin v. LLR, Inc.,* Case No. 17-cv-00931 (N.D. Ohio) (filed Mar. 27, 2017) ("Goodwin Action"); *Doran v. LLR, Inc.,* Case No. 17-cv-00781 (D. Or.) (filed Apr. 17, 2017) ("Doran Action"); *Mack, et al. v. LLR, Inc., et al.*, Case No. 17-cv-00853 (C.D. Cal.) (filed May 2, 2017) ("Mack Action"); *Heinichen, et al. v. LuLaRoe, LLC, et al.*, Case No. 17-cv-02880 (N.D. Cal.) (filed May 18, 2017) ("Heinichen Action").

Each of the Plaintiffs made similar allegations in the separately filed complaints and requested similar relief in the Consolidated Class Action Complaint ("CCAC") and First Amended Consolidated Complaint ("FAC") filed on February 16, 2018 and September 14, 2018, respectively (ECF Nos. 60, 79). And in their answer to Plaintiffs' FAC, Defendants admitted the following allegation: "Before the filing of this lawsuit, Customers who bought and received defective Products were not allowed to return them to Defendants, either for a refund or an exchange." FAC ¶ 80; Defs.' Answer to FAC, ECF No. 82 ¶ 80.

### C. Changes Made to the Leggings' Design and Production Process, Quality Control, and Return Policies After the Lawsuits were Filed

#### 1. Plaintiffs' Experts' Opinions About the Defective Leggings

Plaintiffs hired two experts, Ms. Deborah Young, a textile expert, and Ms. Gabrielle Sampietro, an expert in garment manufacturing. According to Ms. Young, the leggings were defectively designed, and therefore tore and developed holes, because the fabric did not weigh enough and underwent a ▮▮▮▮▮▮▮▮▮▮ that weakened the fibers. Ex. 14 ¶ 12. Both Ms. Young and Ms. Sampietro also identified sizing problems that contributed to holes and tearing. *Id.* ¶¶ 12, 32 and Ex. 15 ¶¶ g and h, pp. 26-27. At the time the FAC was filed, LLR sold the leggings in only two sizes: One Size ("OS") and Tall & Curvy ("TC"). The OS size was represented as fitting sizes 0-12, while the TC was represented as fitting sizes 10 to 20. Ex. 16. According to Ms. Young, "It is unreasonable to expect one garment, OS, to cover several sizes with such a wide range of weights, heights, and shapes." Ex. 14 ¶ 32. And according to Ms. Sampietro, the sizing, combined with fabric that was extensively brushed, also contributed to the development of holes. Ex. 15 ¶ h, pp. 26-27 ("The stretchy, jersey and ▮▮▮▮▮▮ fabric selected by LuLaRoe cannot successfully stretch to larger measurements without ripping or creating holes"). Indeed, Defendants' own supplier testified that it had warned Defendants that, following an investigation of consumer complaints that the Leggings were "bursting and shredding like tissue paper," the issue was caused by the ▮▮▮▮▮▮▮▮▮▮ that LuLaRoe requested. Ex. 18 at 61:19-63:10.

MEMORANDUM OF POINTS AND AUTHORITIES

2.    <u>Sworn Testimony and Documentary Evidence About the Production Process and Changes Thereto</u>

Plaintiffs' experts' opinions are supported by the testimony of Providence, LLC, d/b/a MyDyer ("MyDyer"), which supplied the leggings for LLR from 2016-2018. MyDyer testified that the leggings produced for LLR underwent a process called "brushing" that is like sanding wood. Ex. 18 at 35:17-36:1. The brushing, according to MyDyer, creates puffiness and can make fabric look less sheer or transparent. *Id.* at 36:22-37:2. According to MyDyer, the leggings produced for LLR were ████████████ ██████████████████████████, which is not industry practice. *Id.* at 35:22-36:14. MyDyer also testified that brushing results in weakened fabric. *Id.* at 54:6-9, 64:5-16, 258:9-12. MyDyer identified the brushing as the reason for the complaints of weakened fabric and tearing and recommended that LLR reduce the brushing, but LLR declined. *Id.* at 61:2-63:10, 64:5-16, 83:2-23.

To address concerns related to weakened fabric and tearing, which Plaintiffs sought to remedy via this lawsuit, LuLaRoe began making changes to the Leggings' fabric which improved them as evidenced by ball-burst testing, which measures strength.[4] Specifically, LLR's current supplier testified that ████████████████████████ ██████████████████████. Ex. 19 at 99:10-101:25.

During the lawsuit, discovery also revealed that the amount of brushing applied to the leggings' fabric decreased from ████████ to ████████, further increasing the resilience to the ball-burst test; indeed, Defendants and MyDyer have testified that increased brushing results in weakened fabric fibers. *See* Ex. 18 at 35:10-12, 35:24-36:1; Ex. 20 at 58:14-59:1. These changes were successful: as Plaintiffs' expert opined, all of Defendants' Leggings purchased in 2020 passed ball-bursting in part due to the decrease in brushing, while leggings manufactured in 2016-2017 that were ████████ failed ball-

---

[4] As described in Deborah Young's expert report, ball-burst testing is standardized and is used to test fabric for strength and weakness. Ex. 14 ¶ 35. Fabric that fails ball-burst testing is a sign that the fabric is too weak and susceptible to tearing or ripping and a propensity for developing holes. *Id.*

burst testing.  Ex. 14 ¶ 65.

Moreover, MyDyer testified that towards the end of 2017, the weight of the fabric of the leggings was increased from the range of ███████████████████████ to the range of ███████████████ to make the fabric stronger and address the complaints about quality.   Ex. 18 at 64:22-24, 58:9-59:8.  MyDyer's testimony was consistent with Ms. Young's testimony: the greater the fabric weight, the stronger the fabric.  Ex. 14 ¶¶ 18-19; Ex. 18 at 42:11-14, 58:9-24.

The company also changed the specifications for the leggings so that they were not as small on adult women and fit better.  Originally, the waist specification for the OS leggings was ███████████ ██████████).  Ex. 21 at RSGA0190 (*see* ████████  The specifications were changed ███████ ██████████████████████████████████ *Id.* at RSGA0190 and RSGA019 (██████████); Ex. 19 at 206:20-21 (confirming "[p]hase 3 is the current tech pack," which contains the measurement for the leggings); Ex. 19 at 141:21-24 (████████████████████████████████████████).  The hip width specifications for the OS were also ███████████████ █████████████████████ ██████████████████.  Ex. 21 at RSGA0190 and RSGA019. LLR also changed the sizing of its leggings: OS leggings were changed to fit sizes 2-10, TC leggings were modified to fit sizes 12-18, and a new size, Tall & Curvy 2 ("TC2") was added to fit sizes 20-26. Ex. 17 (current sizes)

### 3. Changes in Quality Control Measures

LuLaRoe's own expert testified that currently, the company employs an inspection process at their warehouse in Fontana, California where a randomly selected number of leggings received from the manufacturer are measured at nine different points, including inseam. Ex. 22 at Part II.B.4.  Ms. Gina Ramirez, a former employee, testified that during the period of 2016-18, she never saw LLR employees inspect the leggings' measurements. Ex. 23 at 10:13-16, 27:25-28:11, 160:12-161:5. Indeed, in an email from Ms. Ramirez to LuLaRoe's Director of Quality Control, dated September 6, 2018, she lamented that

MEMORANDUM OF POINTS AND AUTHORITIES

shipping "junk to our retailers is just so damaging to our already tainted reputation[.]" Ex. 24.

### 4.    The Lawsuits Motivated LuLaRoe to Issue Cash Refunds

Before the filing of the lawsuit, any customer who complained to LuLaRoe about defective leggings was denied a refund and directed to a consultant for an exchange. Ex. 4 ¶¶ 6-7; Ex. 8 at 147:18-149:1. Unfortunately, LuLaRoe only gave consultants wholesale credits toward the purchase of additional clothing which was damaged or back ordered Ex. 1 at pp. 5, ¶2. This discouraged consultants from issuing cash refunds to consumers who wanted them. Plaintiffs specifically alleged that LuLaRoe's no-refund policy was unfair. FAC ¶¶ 80-86.

After this lawsuit started on March 23, 2017, LuLaRoe reversed course and for the first time directly gave cash refunds to customers who complained about defective leggings pursuant to three new return and exchange programs that became effective April 24, 2017 called the Make Good Program, the Happiness Policy and the Limited Warranty Program ("LLR Return Programs"). Exs. 25-27; Ex. 8 at 174:22-25, 204:8-10, 235:10-12. Pursuant to the Make Good Program alone, LuLaRoe issued $1.5 million dollars in cash directly to consumers regardless of whether customers returned the leggings or not. Ex. 28 ¶ 30 and n.4; Ex. 20 at 38:14-18; Ex. 18 at 92:9-13, 93:4-12.

Further, ██████████████████████████████████████████████. Ex. 29 at Supp. Response to Interrogatory No. 4. The value of these benefits provided to proposed Class members and the public pursuant to the Happiness Policy and the Limited Warranty Program was ████████████ (leggings were sold at $25.00 each (Ex. 20 at 166:2-8)).

According to MyDyer, the LLR Return Programs were implemented to "mitigate the class action suits." Ex. 18 at 90:16-91:1 ("As long as they had a return policy in place and the returns were not excessive, it would discredit the class action lawsuit."). These programs, according to LuLaRoe and Mark Stidham, have been administered liberally. Whereas before the lawsuit, LuLaRoe gave no refunds (Ex. 20 at 19:15-20, 20:20-21:1; Ex.

MEMORANDUM OF POINTS AND AUTHORITIES

9), it began to give money back, whether the customer returned the leggings or not and for any reason. Ex. 20 at 33:6-24, 36:16-37:1. LuLaRoe's expert, Jane Martin, opined that the LLR Return Programs "are exceedingly generous and consumer-friendly" compared to other "Fast Fashion" brands. Ex. 22 Part II.C.

### III. <u>PLAINTIFFS ARE ENTITLED TO ATTORNEYS' FEES AND COSTS UNDER CALIFORNIA CODE OF CIVIL PROCEDURE § 1021.5</u>

#### A. The Legal Standard Under California Code of Civil Procedure § 1021.5[5]

California Code of Civil Procedure § 1021.5 provides "an exception to the general rule that each party to a lawsuit bears its own attorneys' fees." *See MacDonald v. Ford Motor Co.*, 142 F. Supp. 3d 884, 890 (N.D. Cal. 2015); *Graham v. DaimlerChrysler Corp.*, 34 Cal. 4th 553, 565 (2004). Specifically, § 1021.5 authorizes a court to "award attorneys' fees to a successful party when the action has resulted in the enforcement of an important right affecting the public interest if: (a) a significant benefit, whether pecuniary or nonpecuniary, has been conferred to the general public or a large class of persons, (b) the necessity and financial burden of private enforcement . . . are such as to make the award appropriate, and (c) such fees should not in the interest of justice be paid out of the recovery, if any." *MacDonald*, 142 F. Supp. 3d at 890 (quoting Cal. Civ. P. Code § 1021.5); *see also Parkinson v. Hyundai Motor Am.*, 796 F. Supp. 2d 1160, 1169 (C.D. Cal. 2010) (quoting Cal. Civ. Proc. Code § 1021.5); *Graham*, 34 Cal. 4th at 565. "Whether [the plaintiff] has proved each of these criteria is a matter primarily vested in the trial court." *Hogar v. Cmty. Dev. Comm'n of the City of Escondido*, 157 Cal. App. 4th 1358, 1364 (2007).

Moreover, under § 1021.5, a plaintiff does not need to obtain a court-ordered change in defendant's behavior to be deemed a successful party. *MacDonald*, 142 F. Supp. 3d at 890. It is enough that a plaintiff's lawsuit motivates the defendant to provide the relief sought. *Id.*; *see also Graham*, 34 Cal. 4th at 567. "Because it can be difficult to prove causation when a plaintiff seeks to recover under this theory and 'action is taken by the

---

[5] Federal courts apply state law for attorneys' fees to state claims because of the *Erie* doctrine. *See Klein v. City of Laguna Beach*, 810 F.3d 693, 701 (9th Cir. 2016).

MEMORANDUM OF POINTS AND AUTHORITIES

defendant after plaintiff's lawsuit is filed,' the chronology of events can give rise [to] the inference that the two events are causally related." *MacDonald*, 142 F. Supp. 3d at 890 (quoting *Californians for Responsible Toxics Mgm't v. Kizer*, 211 Cal. App. 3d 961, 968 (1989)). "Once the inference has been raised, defendants can present evidence to rebut it." *MacDonald*, 142 F. Supp. 3d at 891; *see also Kizer*, 211 Cal. App. 3d at 968. In weighing the credibility of the evidence, the Court must also remain "mindful that 'defendants, on the whole, are usually rather reluctant to concede that the litigation prompted them to mend their ways." *MacDonald*, 143 F. Supp. 3d at 891. As the Ninth Circuit recently explained, "[i]n California, the inference from the chronology of events does not evaporate when the defendant introduces relevant and credible evidence to the contrary; rather the trial court must weigh the evidence and determine on all the evidence, including any inference arising from the chronology, if the plaintiff's story is persuasive." *Edwards v. Ford Motor Co.*, 727 F. App'x 233, 235 (9th Cir. 2018) (citing *Hogar*, 157 Cal. App. 4th at 1367).

### B.  Plaintiffs Are "Successful Parties" Under Section 1021.5

"The term 'successful party,' as ordinarily understood, means the party to litigation that achieves its objectives." *Graham*, 34 Cal. 4th at 571. It does not matter whether those objectives were achieved through a judgment, through a settlement, or through a "voluntary" change in the other party's conduct. *Id.* at 566 ("'[t]he critical fact is the impact of the action, not the manner of its resolution'"). Indeed, it would defeat the purpose of Section 1021.5 and discourage attorneys from representing the public on a contingency basis if a defendant could avoid paying fees by "voluntarily" changing its litigation position at any point before judgment is entered. *Id.* at 574. Thus, the California Supreme Court has embraced the "catalyst theory," under which plaintiffs can recover fees if their lawsuit was "'a catalyst motivating defendants to provide the primary relief sought.'" *Id.* at 567. A plaintiff is a "successful party" under the catalyst theory if "(1) the lawsuit was a catalyst motivating the defendants to provide the primary relief sought; (2) that the lawsuit had merit and achieved its catalytic effect by threat of victory, not by dint of nuisance and threat of expense . . .; and, (3) that the plaintiffs reasonably attempted to settle the litigation prior to

MEMORANDUM OF POINTS AND AUTHORITIES

filing the lawsuit." *Tipton-Whittingham v. City of L.A.*, 34 Cal. 4th 604, 608 (2004).

### 1. Plaintiffs' Primary Relief Sought Has Been Obtained

Courts recognize that "plaintiffs [are] a successful party under § 1021.5" when "plaintiffs achieve[] their primary goals – even assuming they did not achieve all of their requested relief[.]" *Thomas v. Kent*, No. CV 14-8013 FMO (AGRx), 2019 WL 2590170, at *3 n.2 (C.D. Cal. May 30, 2019); *see also MacDonald*, 142 F. Supp. 3d at 891 ("Plaintiffs may be considered successful if they succeed on *any* significant issue in the litigation that achieves *some* of the benefit they sought in bringing suit.") (emphasis added) (internal quotation marks omitted). Here, Plaintiffs achieved *all* of their requested relief on behalf of consumers. From the outset of the litigation, Plaintiffs have sought two forms of relief: monetary damages for past leggings purchases and an order enjoining LuLaRoe from selling defective leggings. Dean Compl. ¶ 1, Prayer for Relief B, D. Plaintiffs maintained the same requests for relief in the FAC, ¶ 1, Prayer for Relief B, D.

As outlined in Section II above, Plaintiffs have achieved both forms of relief. First, LuLaRoe created the LLR Return Programs, from which proposed class members and the public received $1.5 million under the Make Good Program and then were able to return leggings for a total value of ▮▮▮▮▮▮▮ under the other two programs. *See* § II.C.4. The lack of such policies was a central issue outlined in the initial and subsequent complaints. Dean Compl. ¶¶ 11, 12; FAC at ¶¶ 80-86 (alleging that Defendants will not issue refunds or exchanges for consumers who bought defective leggings that ripped or developed holes or were too small.); *see also* Ex. 30 at 97:3-16; Ex. 31 at 83:13-23; Ex. 32 at 28:20-23; Ex. 33 at 27:12-17, 45:23-46:3, 47:7-10, 48:22-25, 50:15-20, 177:21-178:1; Ex. 34 at 82:12-22; Ex. 10 at 167:14-168:13, 168:23-169:4, 190:15-191:12 (testimony about the inability to receive refunds). Notably, LuLaRoe's founder and 30(b)(6) witness corroborated the drastic change in its business practices due to these return programs policies. *See* § II.C.2.

While the pecuniary benefit provided to proposed class members through these programs and policies is significant, the Ninth Circuit and Supreme Court have recognized that even achieving a nominal amount of damages would suffice to classify Plaintiffs as a

"successful party" under Section 1021.5. *See Saint John's Organic Farm v. Gem Cty. Mosquito Abatement Dist.*, 574 F.3d 1054, 1059-60 (9th Cir. 2009) ("[T]he Supreme Court made clear how little actual relief is necessary" to be considered the prevailing parties,[6] explaining that "'a plaintiff who wins nominal damages is a prevailing party'" because a "'judgment for damages in any amount, whether compensatory or nominal, modifies the defendant's behavior for the plaintiff's benefit by forcing the defendant to pay an amount of money he otherwise would not pay.'"). Here, this lawsuit caused LuLaRoe to accept for return ████████████ in merchandise and pay significant amounts of money back to consumers when it otherwise would have not before the lawsuit. This is far more than "nominal damages." Thus, Plaintiffs are the "successful party" under Section 1021.5.

Second, the lawsuit resulted in numerous changes to the leggings' specifications, which directly address the defects raised from the outset of Plaintiffs' litigation. *See* Dean Compl. ¶¶ 8-9 (alleging, on March 23, 2017, that Defendants sold defective leggings that tore, ripped or developed holes, were too small and had inconsistent measurements). As discussed above, LuLaRoe improved the leggings by increasing the weight of the fabric, going from ████████████, increasing the measurement specifications of the leggings, modifying the troublesome sizing, and implementing quality inspection processes at the warehouse. *See* § II.C.

Shortly after Plaintiffs determined that their primary objectives—refunds, an effective return policy and better leggings—had been accomplished, in December 2020, their counsel informed LuLaRoe of this fact and requested that the parties cease further litigation activities, which further evidences that Plaintiffs' primary objectives have been accomplished. *Evans v. DSW, Inc.*, No. 2:16-cv-03791 JGB (SPx), 2018 WL 6920674, at *7 (C.D. Cal. Aug. 17, 2018) (finding that the defendant's remedial conduct was the primary relief that plaintiff sought, as evidenced by the fact that "[i]mmediately after learning of

---

[6] As the California Court of appeals has recognized, "[u]nder section 1021.5, '[a] successful party means a prevailing party." *Sweetwater Union High Sch. Dist. v. Julian Union Elementary Sch. Dist.*, 36 Cal. App. 5th 970, 982 (2019) (internal quotation marks omitted).

[defendant's] changed practice, Plaintiff here sought a determination that she is a successful party under a catalyst theory."). For these reasons, Plaintiffs' lawsuit has not only provided consumers with significant monetary benefits by causing LuLaRoe to implement national and liberally applied return programs and policies, but also led to improvements in the leggings and quality control measures.

### 2.      This Lawsuit Had Merit and Was the Catalyst for LuLaRoe's Changes

"To be a catalyst, the lawsuit must have been 'a substantial causal factor' contributing to Defendant's conduct, though the lawsuit **need not be the only cause** of Defendant's conduct." *Henderson v. J.M. Smucker Co.*, No. CV 10-4524-GHK (VBKx), 2013 WL 3146774, at *4 (C.D. Cal. June 19, 2013) (quoting *Graham*, 34 Cal. 4th at 573) (emphasis added); *Evans*, 2018 WL 6920674, at *7 ("more than one cause of the defendant's conduct will not be fatal to a plaintiff's claim pursuant to the catalyst theory"). "Put another way, courts check to see whether the lawsuit was 'demonstrably influential' in overturning, remedying, or prompting a change in the state of affairs challenged by the lawsuit." *Karuk Tribe of N. Cal. v. Cal. Reg. Water Quality Control Bd.*, 183 Cal. App. 4th 330, 363 (2010). Whether a lawsuit was a catalyst, "[c]ourts consider (1) 'the situation immediately prior to the commencement of suit, and' (2) 'the situation today, and the role, if any, played by the litigation in effecting any change between the two.'" *Evans*, 2018 WL 6920674, at *7 (citing *Hogar*, 157 Cal. App. at 1366).

Here, as discussed in Section II.C., Plaintiffs' primary litigation objectives were to recover monetary relief for class members, to improve LuLaRoe's return policies, and to enjoin LuLaRoe from continuing to manufacture leggings in a defective manner. Plaintiffs met these objectives throughout the pendency of the litigation. Specifically, to "mitigate the class action suits," LuLaRoe created the LLR Return Programs, which paid $1.5 million in cash back to consumers and allowed consumers to return leggings providing a value of ███████ to consumers. Second, after the lawsuit started, LuLaRoe made significant changes to the design of the leggings, as discussed above in Section II.C. The chronology of these events only affirms that the foregoing class relief and changes to Defendants'

MEMORANDUM OF POINTS AND AUTHORITIES

business practice changes were, at least in part, due to Plaintiffs' lawsuit. *In re Taco Bell Wage & Hour Actions*, 222 F. Supp. 3d 813, 825 (E.D. Cal. 2016) ("The timing of the change . . . is circumstantial evidence from which the Court finds that this lawsuit was the reason that [defendant] changed its . . . policy.").

        3.    <u>Plaintiffs' Lawsuit Was Not "Frivolous, Unreasonable, or Groundless"</u>

Under California's catalyst doctrine, a plaintiff must show "that the lawsuit had merit and achieved its catalytic effect by threat of victory, not by dint of nuisance and threat of expense[.]" *Tipton-Whittingham*, 34 Cal. 4th at 608. To have merit under § 1021.5, a case need only rise above being "'frivolous, unreasonable or groundless'" or a "nuisance suit." *Graham*, 34 Cal. 4th at 575. While the court should review the factual record to make this determination, the determination is "not a final decision on the merits but a determination at a minimum that the questions of fact and law are grave and difficult." *Thomas*, 2019 WL 2590170, at *5 (internal quotation marks omitted). This case easily meets this standard. Plaintiffs alleged that LuLaRoe sold defective leggings and the Court sustained Plaintiffs' claims for violations of various consumer protection statutes, including the UCL, for unjust enrichment and for breach of the implied warranty of merchantability. *See* Order (ECF No. 92). Moreover, Plaintiffs' expert reports and LuLaRoe's own internal documents show that LuLaRoe sold defective leggings. *See* Section II.C, *supra*. Further, the meritorious nature of Plaintiffs' claims is supported by LuLaRoe's implementation of the LLR Return Programs and the changes they made to their business practices as described above in Section II.C.

Far from being a "nuisance suit," this action is precisely like other consumer protection actions found to merit catalyst fees under Section 1021.5. *See*, *e.g.*, *Skinner v. Ken's Foods, Inc.*, 53 Cal. App. 5th 938, 945, 948 (2020) ($387,593 in "catalyst" fees awarded where lawsuit spurred salad dressing maker to change misleading labels); *MacDonald*, 142 F. Supp. 3d at 894 (lawsuit had merit and award of fees under Section 1021.5 proper where suit drove automaker to issue a recall for defective coolant pumps); *Henderson*, 2013 WL 3146774, at *9 (suit that compelled defendant to remove false and

misleading health claims from certain products had merit under Section 1021.5).

#### 4.    Plaintiffs Reasonably Attempted to Settle Before Litigating

"[A] plaintiff seeking attorney fees under a catalyst theory must first reasonably attempt to settle the matter short of litigation." *Graham*, 34 Cal. 4th at 577. The bar is not high: "[l]engthy prelitigation negotiations are not required, nor is it necessary that the settlement demand be made by counsel, but a plaintiff must at least notify the defendant of its grievances and proposed remedies and give the defendant the opportunity to meet its demands within a reasonable time." *Id.*; *Evans*, 2018 WL 6920674, at \*10 (same). Here, before filing suit, Plaintiffs Mack and Benjamin served notice and demand letters pursuant to California's CLRA and Texas' DTPA, respectively, requesting that LuLaRoe remedy their conduct and their violations of the statutes on a class-wide basis. Ex. 12 at 1-4; Ex. 13 at Ex. 1.  In response to Plaintiff Mack's CLRA letter, LuLaRoe denied all allegations and did not offer to remedy their conduct on a class wide basis as requested. Ex. 12 at 6-12.  As to Plaintiff Benjamin's DTPA letter, LuLaRoe demanded Plaintiff Benjamin present her LuLaRoe products for inspection.  Ex. 13 at ¶¶ 4-7. Despite all of the coordination by Ms. Benjamin and her counsel, and Ms. Benjamin having to travel more than 600 miles round trip for the inspection, LuLaRoe provided no substantive response to her DTPA letter.  *Id.* ¶ 8.  Moreover, Ms. Dean unsuccessfully tried to obtain a refund before filing the first lawsuit, and even started a Facebook page about the defective leggings.  Ex. 4.  But even bad PR did not motivate LuLaRoe to change the no-refund policy or to their production process.  It was not until after the lawsuits were filed that LuLaRoe took steps to "discredit" the class actions by changing their practices, as discussed above in Section II.  In short, Plaintiffs made reasonable efforts to settle before filing suit.

In any event, even if the Court was to find that these pre-suit efforts were insufficient, the requirement that the plaintiff reasonably attempt to settle the case before litigation "may be excused where such attempts would have been futile." *MacDonald*, 142 F. Supp. 3d at 894 (following *Cates v. Chiang*, 213 Cal. App. 4th 791, 815 (2013)); *see also Henderson*, 2013 WL 3146774, at \*10 (citing *Cates*, 213 Cal. App. 4th at 817).  Because the rule was

MEMORANDUM OF POINTS AND AUTHORITIES

"judicially-created … to promote the purposes of section 1021.5 and deter attorneys from filing meritless suits merely to obtain attorney's fees, it should not be applied to bar an attorney fees recovery where to do so would defeat the core purpose of the statute." *Cates*, 213 Cal. App. 4th at 816.  It should not be invoked "blindly" without considering whether settlement attempts would have avoided the need for the lawsuit and whether the plaintiff's motivations were directed toward seeking the relief demanded, instead of attorneys' fees. *Cates*, 213 Cal. App. 4th at 817.

While LuLaRoe may argue that further pre-suit discussions may have been productive, its track record, its litigation history in this case, and the repeated consumer and consultant complaints that fell on deaf ears tell a different story.  Indeed, LuLaRoe has a well-documented history of refusing to remedy misconduct without litigation. First, as discussed *supra*, in 2016, Ms. Dean reached out to the company to obtain a refund but was denied a refund. *See Cates*, 213 Cal. App. 4th at 815 (finding that settlement efforts requirement was excused due to futility in part because "Cates's employer, which had the duty to enforce gambling laws, had apparently taken no action in response to Cates's workplace complaints."). Moreover, LuLaRoe has been sued by the Washington Attorney General for running an illegal pyramid scheme; by the Pennsylvania Attorney General for failing to provide or delay cash refunds to consultants canceling their business relationship pursuant to a buy back policy; by consumers for charging sales tax in states where there is no sales tax; by artists for misappropriating artwork for use as prints on LuLaRoe clothing; by employees for violating labor and employment laws; and by MyDyer for not paying for millions of dollars in leggings ordered; and in this suit for selling defective leggings.[7] Indeed, CEO Mark Stidham once proudly announced, "We have budgeted for litigation

---

[7] *State of Wash. v. LLR, Inc., et al.*, No. 19-2-02325-2 WEA (Super. Ct. Wa. King Cty.); *Commonwealth of Pa., Office of the Att'y Gen. v. LuLaRoe, LLC, et al.*, No. 2020-cv-9737 (Pa. Comm. Pleas Ct. Dauphin Cty.); *Van, et al. v. LLR Inc. d/b/a LuLaRoe, et al.*, No. 3:18-cv-00197 (D. Alaska); *Kunath v. LuLaRoe, LLC, et al.*, Case No. 18-cv-02100 (C.D. Cal.); *Libreros, et al. v. LLR, Inc.*, No. RIC1714426 (Cal. Super. Ct. Riverside Cty.); *Providence Indus., LLC, v. LuLaRoe, Inc.*, No. RIC825263 (Cal. Sup. Ct.).

17                    Case No. 5:17-cv-00853-JGB-SHK

from day one[.]" Ex. 35. Further, in a press release issued by Pennsylvania AG Josh Shapiro, a former consultant was quoted as stating, "Because they were so backlogged with consultants leaving, my paperwork to receive my refund wasn't reviewed for several weeks, if not months, after I left the business. LulaRoe didn't keep their promise to consultants, and didn't care if we left, stayed, *or even threatened to sue*." Ex. 36 (emphasis added).

Moreover, courts have found that pre-suit settlement efforts would have been futile based on defendant's overly litigious strategy in the case at hand. *See Evans*, 2018 WL 6920674, at *11; *Cates*, 213 Cal. App. 4th at 815. Here, LuLaRoe filed multiple rounds of motions to dismiss, deposed each named Plaintiff, hired experts to draft expert and rebuttal reports, and fought at every juncture of discovery. Moreover, there is no evidence that Plaintiffs were motivated by the recovery of attorney's fees in filing the suit. Instead, "[P]laintiff's motivations were directed at the relief demanded, as opposed to the recovery of attorney fees." *Cates*, 213 Cal. App. 4th at 817 (holding that rule requiring pre-suit settlement efforts "should not be applied blindly without any consideration of whether . . . the plaintiff's motivations were directed toward seeking the relief demanded, as opposed to the recovery of attorney fees."). Plaintiffs' counsel vigorously and successfully defeated LuLaRoe's several attempts to defeat the case at the motion to dismiss stage, reviewed over a million documents, took and defended numerous depositions, retained experts, and prepared expert reports. It was only after Plaintiffs discovered the full extent of LuLaRoe's changes in practices, which LuLaRoe tried to hide during discovery by producing large document dumps and producing evasive witnesses for deposition, that Plaintiffs decided to end the suit as all the original relief sought had been obtained.

In short, based on the history outlined above, there is a reasonable basis to conclude any additional attempts to settle other than the ones Plaintiffs made "'would have been futile'" and a "'waste of time.'" *See Cates*, 213 Cal. App. 4th at 815. "Under these particular circumstances, it would be contrary to the language of section 1021.5 and the underlying legislative intent to bar [Plaintiffs] from recovery based solely on [their] failure to provide a timely prelitigation demand letter." *See id.* at 816. "As the California Supreme Court has

MEMORANDUM OF POINTS AND AUTHORITIES

stated in another context: 'Generally a demand is not a prerequisite where it would be futile or an idle gesture.'" *Id.* "'The law does not require useless acts from litigants as prerequisites to seeking relief from the courts.'" *Id.* The Court should exercise it's "broad discretion" and find that this factor has been satisfied. *Id.* at 817.

### C.   Plaintiffs Have Conferred Significant Benefits

As Plaintiffs show above, this case has resulted in over ▮▮▮▮▮▮ in cash refunds and exchanges to consumers in addition to meaningful changes to LuLaRoe's business practices. Given that these refunds, exchanges, and changes to the Leggings' manufacturing and design affect hundreds of thousands of consumers nationwide, Plaintiffs have clearly shown that the case has provided a significant benefit on not only the multi-state classes, but the general public. *Graham*, 34 Cal. 4th at 578 (holding that plaintiffs "met the substantial benefit [. . .] requirement[] of section 1021.5" when the "lawsuit benefited thousands of consumers[.]"). Indeed, this Court has found this element to be satisfied when the benefits were proffered onto only a California class. *See Evans*, 2018 WL 6920674, at *12 (holding that the "[s]ignificant [b]enefit" element was met when the relief affected California residents who purchased defendant's product). For these reasons, Plaintiffs' lawsuit has provided a substantial benefit to the putative classes and the general public under Section 1021.5.

### D.   Plaintiffs Enforced an Important Right Affecting the Public Interest

Under Section 1021.5, the court must determine "'whether there was an important public interest at stake.'" *Evans*, 2018 WL 6920674, at *11. The "enforcement of the California consumer protection laws" qualifies as "an important right affecting the public interest." *Colgan v. Leatherman Tool Grp., Inc.*, 135 Cal. App. 4th 663, 703 (2006) (citing *Lavie v. Proctor & Gamble Co.*, 105 Cal. App. 4th 496, 503 (2003) (noting that the evaluation of whether an advertisement is deceptive under the Unfair Competition Law "has important public policy implications for California consumers and businesses"). Since Plaintiffs brought suit pursuant to the UCL, they meet this requirement. *See Edwards v. Ford Motor Co.*, No. 11CV1058-MMA (BLM), 2016 WL 1665793, at *7 (S.D. Cal. Jan.

MEMORANDUM OF POINTS AND AUTHORITIES

22, 2016); *MacDonald*, 142 F. Supp. 3d at 895-96; *Henderson*, 2013 WL 3146774, at *10.

**E.    The Necessity and Financial Burden of Private Enforcement Makes the Award Appropriate**

"[T]he necessity and financial burden requirement 'really examines two issues: whether private enforcement was necessary and whether the financial burden of private enforcement warrants subsidizing the successful party's attorneys.'" *In re Conservatorship of Whitley*, 50 Cal. 4th 1206, 1214 (2010). Both considerations are fully satisfied here.

**1.    Private Enforcement was Necessary**

Section 1021.5's "necessity prong" is satisfied where "there is no indication that the government was inclined to take action against [the defendant] to prevent its alleged conduct." *Shvager v. ViaSat, Inc.*, No. CV 12-10180 MMM (PJWx), 2014 WL 12585790, at *16 (C.D. Cal. Mar. 10, 2014). The "question for the purposes of § 1021.5 is whether public enforcement was 'adequate.' Accordingly, even where a public official or agency may be officially *appointed* to enforce a right, the necessity of private enforcement element will still be met if that agency does not act." *Indep. Living Ctr. of S. Cal. v. Kent*, No. 2:08-cv-03315-CAS-MANx, 2019 WL 3717793, at *9 (C.D. Cal. Aug. 6, 2019). Here, "no government action [is] being taken to vindicate [Plaintiffs'] rights." *Robinson v. City of Chowchilla*, 202 Cal. App. 4th 382, 401 (2011). To date, the attorneys general of Washington and Pennsylvania investigated and thus were aware of LuLaRoe's business practices, but chose not to take any action on behalf of the consumers who bought defective leggings from consultants. Ex. 2 ¶¶ 4.3, 4.8, 4.11-4.12; Ex. 36. Plaintiffs' decision to pursue this litigation on behalf of consumers reflects the need to correct such injustices. *Henderson*, 2013 WL 3146774, at *12. ("California courts have specifically recognized the 'significant role ... private consumer enforcement plays for many categories of unfair business practices,' including misrepresentations in labels and advertising.'"). Thus, private enforcement was necessary here.

**2.    Plaintiffs Meet the Financial Burden Prong**

An award of attorneys' fees to the prevailing party under Section 1021.5 is proper

MEMORANDUM OF POINTS AND AUTHORITIES

"'when the cost of the claimant's legal victory transcends his personal interest, that is, when the necessity for pursuing the lawsuit placed a burden on the plaintiff out of proportion to his individual stake in the matter.'" *Woodland Hills Residents Ass'n, Inc. v. City Council of L.A.*, 23 Cal. 3d 917, 941 (1979) (quoting *Cty. of Inyo v. City of L.A.*, 78 Cal. App. 3d 82, 89 (1978)). The California Supreme Court has laid out the multistep analysis under the financial burden prong. *Whitley*, 50 Cal. 4th 1206, 1215–16. First, the trial court estimates the monetary value of the benefits obtained by the successful litigants themselves. The court must then "discount these total [estimated] benefits by some estimate of the probability of success . . . ." *Id.* at 1215. "[T]he court must then turn to the costs of the litigation -- the legal fees, deposition costs, expert witness fees, etc., which may have been required to bring the case to fruition[.]" *Id.* at 1215–16. Finally, the court must "place the estimated value of the case beside the actual cost and make the value judgment whether it is desirable to offer the bounty of a court-awarded fee in order to encourage litigation of the sort involved in this case[.]" *Id.* at 1216.

### a. *The Monetary Value Of The Benefits*

Courts have recognized that in determining the monetary value of the benefits, the court should look at each plaintiffs' ***individual stake*** in the litigation, even in the context of consumer class actions. *See e.g., Henderson*, 2013 WL 3146774, at *12 n.13 (holding, in a consumer class action, the court should look to the "'estimated value of the plaintiff's individual stake in the action … and the cost of the litigation'" and finding that "Plaintiff meets the 'financial burden' prong" when "assert[ing] that her purchases of the relevant Products 'totaled just $214.25' over ten years.'") (quoting *Lyons v. Chinese Hosp. Ass'n*, 136 Cal. App. 4th 1331, 1354 (2006)); *see also Edwards*, 2016 WL 1665793, at *8 ("Plaintiff's individual stake in this matter was small, Plaintiff estimates her attorneys have incurred $189,451 in litigation costs. Accordingly, Plaintiff satisfies this factor."). Indeed, the test outlined by the Supreme Court of California instructs the same: "An award on the private attorney general theory is appropriate when the cost of the claimant's legal victory transcends his ***personal interest***, that is, when the necessity for pursuing the lawsuit placed

a burden on the plaintiff out of proportion to his ***individual stake*** in the matter." *Whitley*, 50 Cal. 4th at 1215 (emphasis added) (internal quotation marks omitted).

Here, Plaintiffs' individual stakes are relatively minimal. Plaintiff Benjamin spent approximately $728.16 on Leggings; Plaintiff Doran spent approximately $150; Plaintiff Goodwin spent approximately $29.63; Plaintiff Jones spent approximately $2,625 to $2,750; and Plaintiff Mack spent approximately $862.50 to $1,006.25.[8] *See* Ex. 37 at Response to Special Interrogatory Nos. 1 and 2. Collectively, Plaintiffs' total individual stake is approximately $4,395.29-$4,664.04. As demonstrated below, the value of Plaintiffs' individual stakes should be discounted by 50% given the probability of success in this complex litigation. Therefore, Plaintiffs' individual stakes in this litigation are approximately $2,197.65 to $2,332.02.

> b.     *The Value Of The Individual Stakes Is Discounted By The Probability Of Success*

"A plaintiff's reasonable expectation of financial benefits is analyzed by 'discounting the monetary value of the benefits that the successful litigant reasonably expected at the time the vital litigation decisions were made by the probability of success at that time.'" *Bentley v. United of Omaha Life Ins. Co.*, No. CV 15-7879-DMG (AJWx), 2020 WL 3978090 (C.D. Cal. Mar. 13, 2020) (quoting *Whitley*, 50 Cal. 4th at 1214); *L.A. Police Protective League v. City of L.A.*, 188 Cal. App. 3d 1, 9 (1986) (the court "must discount these total benefits by some estimate of the probability of success at the time the vital litigation decisions were made which eventually produced the successful outcome."). For example, if plaintiffs had only a one-third chance of success, the estimated value of the benefits, for purposes of this analysis, is only one-third the actual recovery. *See Beasley v. Wells Fargo Bank, N.A.*, 235 Cal. App. 3d 1407, 1414 (1991).

---

[8] Plaintiff Mack purchased two forms of Leggings, standard Leggings at $25 per pair and Disney Leggings at "$30-35" per pair. *See* Ex. 37 at Response to Special Interrogatory No. 2. To yield an estimate, Plaintiffs have blended Plaintiff Mack's purchase prices to $28.75 (derived from taking the average price between the Disney Leggings and standard Leggings) for the purposes of this calculation.

In assessing the probability of ultimate victory, courts have considered the specific circumstances of each case that posed a serious risk to plaintiffs' claims. *See id.* at 1416 (finding plaintiffs' likelihood of success in a consumer class action was no greater than 50 percent based on the complexity of the case and defendant's available resources); *Cates*, 213 Cal. App. 4th at 823 (finding it unlikely that any reasonable lawyer would have predicated even a 50-percent chance of ultimate success based on difficulty of prevailing on claims alleged); *City of Oakland v. Oakland Police & Fire Ret. Sys.*, 29 Cal. App. 5th 688, 700 (2018) (upholding 33 percent as the discount factor in a case where plaintiffs litigated claims relating to overpayments made to retirees). For example, in *Beasley*, plaintiffs brought a consumer class action alleging that defendant improperly assessed fees to credit card customers who failed to make a timely payment. 235 Cal. App. 2d at 1412. There, the court held that in view of the complexity of the case, and the litigation resources available to the plaintiffs as compared with the virtually unlimited resources available to defendant, "[i]t is safe to say that plaintiff's likelihood of success was no greater than 50 percent, and probably much less." *Id.* at 1416.

Here, just like in *Beasley*, Plaintiffs filed a complex consumer class action that, in large part, was rooted in a dispute over the technical aspects of Defendants' garment design and manufacturing process. *See* FAC ¶¶ 10-11, 15; *see generally* Exs. 14 and 15. And similar to *Beasley*, the litigation resources available to individual consumers pales in comparison to LuLaRoe's virtually unlimited resources. Based on this, and counsel's experience litigating similar consumer class actions, it is reasonable to estimate that Plaintiffs had a 50 percent probability of success at the start of litigation.  Rivas Decl. ¶ 40. Moreover, the chance of recovering any judgment from Defendant would be very small. *Id.*

c.  *The Discounted Values Of The Individual Stakes Are Far Outweighed By Plaintiffs' Fees And Costs*

Here, Plaintiffs' discounted individual stakes are far outweighed by Plaintiffs' counsel's fees and costs; specifically, as noted above, the discounted individual stakes for the Plaintiffs is no greater than $2,332.02. This pales in comparison to Plaintiffs' fees and

MEMORANDUM OF POINTS AND AUTHORITIES

costs: counsel have expended approximately 10,752 hours to date and $200,000.00 in expert fees and other costs. Rivas Decl. ¶ 41. Thus, pursuing the lawsuit has placed a burden on Plaintiffs out of proportion to their individual stakes in the matter such that not awarding their attorneys' fees would put an undue burden on them. *Tourgeman v. Nelson & Kennard*, 222 Cal. App. 4th 1447, 1467 (2014) ("Where a plaintiff files a lawsuit in which he stands to gain little or no personal relief, the possibility of an adverse award of costs may outweigh the personal relief that the plaintiff seeks."); *Bottoni v. Sallie Mae, Inc.*, No. C 10-03602 LB, 2013 WL 12312794, at *5 (N.D. Cal. Nov. 21, 2013) ("the necessity and financial burden of private enforcement make a fee award appropriate because an individual plaintiff, particularly one in default on student loans, cannot be expected to litigate complex claims against a defendant with substantial resources and defenses."). As noted by the *McDonald* court, "a class action lawsuit constitutes a financial burden." 142 F. Supp. 3d at 896 n.6.

In any event, even if Plaintiffs' individual stakes did outweigh their actual costs, the Court should still find that fees and costs are warranted under Section 1021.5 because of the benefits the public received as a result of the litigation in this case. *See City of Oakland*, 29 Cal. App. 5th at 709-10 (citing *Police Protective League*, *supra*, 188 Cal. App. 3d at 7-9); *Beasley*, 235 Cal. App. 3d at 1417 ("We therefore conclude that even if the estimated value of this case is viewed as exceeding actual litigation costs by a substantial margin, the public benefits from the litigation are so significant that an award of fees under section 1021.5 is appropriate."). Thus, attorneys' fees and cost are warranted under § 1021.5.

## IV. IN THE ALTERNATIVE THE COURT MAY GRANT ATTORNEYS' FEES BASED ON THE COMMON FUND DOCTRINE

In the alternative, if the Court is not inclined to grant Plaintiffs' request for attorneys' fees pursuant to California's private attorney general statute, Plaintiffs respectfully request that the Court do so under the common fund doctrine ("CFD"). *See AdTrader, Inc. v. Google LLC*, No. 17-CV-07082-BLF, 2020 WL 1921774, at *4, *7 (N.D. Cal. Mar. 24, 2020) (denying catalyst motion but granting attorneys' fees under the CFD as an alternative basis).

The CFD "provides that a private plaintiff, or his attorney, whose efforts create,

discover, increase or preserve a fund to which others also have a claim is entitled to recover from the fund the costs of his litigation, including attorneys' fees." *Vincent v. Hughes Air W., Inc.*, 557 F.2d 759, 769 (9th Cir. 1977). As is the case with the "successful party" standard under Cal. Civ. P. Code § 1021.5, an "adjudication on the merits is not a prerequisite to the formation of a common fund." *Indep. Living Ctr. of S. Cal.*, *Inc. v. Kent*, 909 F.3d 272, 285 (9th Cir. 2018). However, unlike the "successful party" standard, the Ninth Circuit has not required any causal connection between the lawsuit and the common fund; rather, the Ninth Circuit has stated that the "central issue" is "whether [plaintiffs'] efforts meaningfully benefited the class[.]" *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*, 914 F.3d 623, 642 (9th Cir. 2019). Thus, the Court may award attorneys' fees under the CFD if: "(1) the class of beneficiaries is sufficiently identifiable, (2) the benefits can be accurately traced, and (3) the fee can be shifted with some exactitude to those benefiting." *AdTrader*, 2020 WL 1921774, at *5 (quoting *Indep. Living Ctr.*, 909 F.3d at 285).

Plaintiffs meet all three elements. After the lawsuit was filed, LuLaRoe initiated certain return programs and policies from which class members were provided approximately ▮▮▮▮▮ in value in the form of cash payments and returns. Further, to receive a refund, gift card, or product replacements, consumers were required to submit claims. Ex. 38.  Since LuLaRoe can trace the specific consumers to which it issued refunds, gift cards or product replacements, the class of beneficiaries is sufficiently identifiable, and the benefits accurately traced.  *See AdTrader, Inc.*, 2020 WL 1921774, at *6; *Wilson v. TE Connectivity Networks, Inc.*, No. 14-cv-04872-EDL, 2019 WL 4242939, at *7 (N.D. Cal. Sept. 6, 2019); *Indep. Living Ctr.*, 909 F.3d at 285. The third factor is met because Plaintiffs will seek a specific amount of fees and expenses. *Wilson*, 2019 WL 424939, at *7.

## V.    CONCLUSION

Based on the foregoing, Plaintiffs respectfully request that the Court grant this motion and deem Plaintiffs the successful party under § 1021.5.  In the alternative, Plaintiffs request fees and costs under the common benefit doctrine.

Date: March 8, 2021                    Respectfully submitted,


                                       /s/ Benjamin Heikali

                                       **FARUQI & FARUQI, LLP**
                                       Benjamin Heikali (State Bar No. 307466)
                                       Email: *bheikali@faruqilaw.com*
                                       Joshua Nassir (State Bar No. 318344)
                                       Email: *jnassir@faruqilaw.com*
                                       10866 Wilshire Boulevard, Suite 1470
                                       Los Angeles, California 90024
                                       Telephone: (424) 256-2884
                                       Facsimile: (424) 256-2885

                                       **GIBBS LAW GROUP**
                                       Rosemary Rivas (State Bar No. 209147)
                                       Email: *rmr@classlawgroup.com*
                                       505 14th Street, Suite 1110
                                       Oakland, CA 94612
                                       Telephone: (510) 350-9700
                                       Facsimile: (510) 350-9701

MEMORANDUM OF POINTS AND AUTHORITIES